IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
February 3, 2005 Session

# STATE OF TENNESSEE v. PAUL DENNIS REID, JR.

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Court for Montgomery County**
**No. 38887     John H. Gasaway, III, Judge**

---

**No. M2001-02753-SC-DDT-DD - Filed May 24, 2005**

---

The defendant, Paul Dennis Reid, Jr., was convicted of two counts of premeditated first degree murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery.  In imposing a death sentence for each count of first degree murder, the jury found three aggravating circumstances, i.e., that the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person, that the murders were especially heinous, atrocious or cruel in that they involved torture or serious physical abuse beyond that necessary to produce death, and that the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another, had been proven beyond a reasonable doubt.  Tenn. Code Ann. § 39-13-204(i)(2), (5), (6) (2003).  In addition, the jury found that the evidence of aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt.  Tenn. Code Ann. § 39-13-204(c) (2003).  The Court of Criminal Appeals affirmed the convictions and the death sentences.

After the case was docketed in this Court, we entered an order identifying numerous issues for oral argument.  We now hold as follows:  1) the trial court did not err in finding that the defendant was competent to stand trial; 2) the trial court did not err in excluding evidence during the competency hearing; 3) the trial court did not err in refusing to hold a new competency hearing on the basis that a court-appointed expert was biased; 4) the evidence was sufficient to support the defendant's convictions; 5) the trial court did not err in denying the defendant's motion to dismiss on the basis that the aggravating circumstances were not stated in the indictment; 6) the trial court did not err in allowing the prosecution to amend the indictment; 7) the trial court did not commit reversible error in limiting extrinsic evidence of inconsistent statements; 8) the evidence was sufficient to support the aggravating circumstances found by the jury; 9) the death sentences were not arbitrary or disproportionate as imposed in this case; 10) the evidence was sufficient to support the jury's finding that evidence of aggravating circumstances outweighed evidence of mitigating circumstances; 11) the capital sentencing statutes are not unconstitutional on the basis that they allow evidence to be admitted in violation of due process and confrontation under the United States Constitution; 12) the trial court did not err in admitting photographs of the victims at the crime scene during sentencing;

13) the trial court did not commit reversible error in failing to charge the jury on the "catch-all" statutory provision as to mitigating circumstances; and 14) the trial court did not err in denying a new trial based on prosecutorial misconduct during sentencing. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, the Court of Criminal Appeals' judgment is affirmed.

 **Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a separate concurring/dissenting opinion.

James A. Simmons and Thomas F. Bloom, Nashville, Tennessee, for the Appellant, Paul Dennis Reid, Jr.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Associate Deputy Attorney General; John W. Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The defendant, Paul Dennis Reid, Jr., was indicted for two counts of premeditated murder, two counts of felony murder during the perpetration of a robbery, two counts of especially aggravated kidnapping, and one count of aggravated robbery. The evidence presented during trial is summarized as follows.

### Guilt Phase

On the night of April 23, 1997, Angela Holmes, age twenty-one, and Michelle Mace, age sixteen, were working at a Baskin-Robbins store on Wilma Rudolph Boulevard in Clarksville, Tennessee. The store regularly closed at 10:00 p.m. At around 10:10 p.m., Craig Mace arrived at the store to pick up his sister, Michelle. He noticed that Angela Holmes' car was in the parking lot and that the lights inside the store were on. He entered the store through an unlocked door and found no one inside. Mace called 911.

Officers were dispatched to the scene and searched the store. They found the cash register drawer empty, except for some coins, and a safe in an office with the top removed.[1] The victims' purses were found at the store; no money had been taken from the purses. A mop and bucket were found in the customer area, and the freezer was left open.

---

[1] The owner of the store testified that $1,565.58 had been stolen.

On the morning of April 24, 1997, the bodies of Angela Holmes and Michelle Mace were found at the Dunbar Cave State Natural Area in Montgomery County, Tennessee, which was between 2.1 and 3.6 miles from the Baskin-Robbins store.[2] Both victims had suffered deep stab wounds to their necks, as well as stab wounds, cuts, and abrasions to other parts of their bodies. Both had bled to death.

Lavanda Zimmerman testified that she had visited with the victims at the Baskin-Robbins store from 9:20 p.m. until 10:00 p.m. on April 23, 1997. At one point, a man in his late twenties or early thirties entered the store and became "obnoxious" and "very loud" about the prices before leaving. As Zimmerman left the store at 10:00 p.m., she saw a "shiny red" car enter the parking lot. Although she testified that a photograph of the defendant's car – a 1997 red, four-door Ford Escort – was "consistent" with the car she had seen, she conceded that she told a private investigator prior to trial that the car was "dark reddish or maroon." She also conceded that she did not tell officers about the car when she was interviewed in May of 1997.

George Hertenstein testified that he was driving to work at 9:59 p.m. on April 23, 1997, when he saw a car driving slowly on Rossview Road near the Baskin-Robbins store. When Hertenstein attempted to pass the car, the car abruptly turned onto Union Hall Road, which was one road after the entrance to the Baskin-Robbins store. Hertenstein testified that the car was "identical" to photographs of the defendant's car. On cross-examination, Hertenstein admitted that he contacted police in June of 1997 after he saw pictures of the defendant's car on the television news. He also acknowledged that he told a private investigator that the car he saw had two doors, whereas the defendant's car had four doors.

Jerry Perdue, a friend of Michelle Mace, testified that he saw a small red car in the Baskin-Robbins parking lot shortly after 10:00 p.m. on April 23, 1997. He further testified that photographs of the defendant's car "could very well be" the car he saw in the parking lot. He acknowledged that he told law enforcement officers that the car he saw was a two-door hatchback but that he was no longer sure. He also stated that he told officers that the car had black bumpers.

Elfrieda Lane testified that she was a friend of the defendant and that she lived three miles from the Baskin-Robbins store in Clarksville, Tennessee. Lane testified that the defendant called her "once or twice" a week from February to April of 1997 and that they discussed the defendant's effort to be re-hired at a Shoney's restaurant. Lane testified that the defendant was at her home on or about April 18, 1997, and that he had been driving a red car. According to Lane, the defendant telephoned her on April 24; he told her that he had planned to visit her the previous evening but that it had gotten too late.

Business records revealed that the defendant purchased gasoline at a Texaco station in Clarksville at 9:45 p.m. on April 23, 1997. The Texaco station was 0.7 miles from Lane's home and

---

[2] Detective Robert Miller testified that three different routes could be taken to travel from Baskin-Robbins to Dunbar Cave park. The driving time for the three routes ranged from four to five minutes.

0.9 miles from the Baskin-Robbins store. A signed credit card receipt showed that the defendant purchased $11.95 worth of gasoline. Handwriting experts confirmed that the signature on the receipt was the defendant's. A copy of the receipt was also found in the defendant's wallet.

Jay Smith and Shannon Reeves testified that they saw a car near Dunbar Cave around 10:30 p.m. on the night of April 23, 1997. They were at the home of Smith's girlfriend, Holly Schmidt, who lived across the street from the Dunbar Cave entrance and parking lot. Smith testified that the car was a red four-door and that he thought it was "odd" because the car was not in a parking space. Smith, a friend of Michelle Mace, conceded that he had told officers the car looked like several makes of cars, none of which matched the defendant's car. Smith nonetheless testified that the car he saw was "consistent" with photographs of the defendant's car. Reeves testified that he saw a car in the Dunbar Cave parking lot. Although he could not make out any details about the car, he noticed that the car's headlights were on and, at one point, changed from low to high beam.

Samero Zavaro, a serologist and DNA specialist with the Tennessee Bureau of Investigation, testified that a DNA sample taken from blood found on the defendant's left tennis shoe was consistent with the DNA profile of Angela Holmes. In addition, a DNA sample taken from small blood stains found on the right tennis shoe was consistent with a mixture of two or more donors from which neither Angela Holmes nor Michelle Mace could be excluded. Zavaro testified that the probability of selecting an unrelated individual that would have the same DNA profile as the sample on the defendant's left shoe was one in 6,800 Caucasian individuals and one in 4,400 African-American individuals.

Meghan Clement, as associate director of forensic identity testing at Laboratory Corporation of America ("LabCorp"), testified about additional DNA testing. She testified that the DNA sample found in the blood on the defendant's left shoe was consistent with the DNA profile of Angela Holmes. The DNA sample found in the blood on the defendant's right shoe did not exclude the defendant, Angela Holmes or Michelle Mace. Clement testified that a combined statistical analysis revealed that the probability that the blood found on the defendant's left shoe was from a person other than Angela Holmes was one in 1,810,000 in the Caucasian population, one in 3,250,000 in the African-American population, one in 4,950,000 in the Southeastern Hispanic population, and one in 4,520,000 in the Southwestern Hispanic population.

Linda Littlejohn, a fiber comparison specialist with the Tennessee Bureau of Investigation, testified that fibers found on the victims' clothing were compared to fibers in the defendant's car. According to Littlejohn, three fibers found on Angela Holmes' clothing were consistent with samples taken from the defendant's backseat and floor mats. Similarly, eight fibers found on Michelle Mace's clothing and shoes were consistent with fibers from the defendant's backseat, carpet, and the edge of the backseat. Littlejohn testified that it was "a very rare case that you find eleven fibers that match one source." Moreover, the evidence showed that the floor mats found in the defendant's car were not standard for the Ford Escort, but rather, had been purchased by the defendant at Wal-Mart on March 25, 1997.

Littlejohn testified that she also analyzed photographs of footprints found at Baskin-Robbins and Dunbar Cave, as well as nine pairs of shoes belonging to the defendant. Littlejohn conceded that the shoe prints did not match the defendant's shoes.

Two witnesses testified that the defendant had told them that he could make money by committing robberies. Danny Tackett testified that he was working with the defendant at Shoney's in January of 1997 when the defendant suggested robbing a "fast food place [in the] middle of the night" because there were "no witnesses." Tackett thought the defendant was joking. Likewise, Jeffery Potter testified that in January of 1997, the defendant expressed dissatisfaction with his job and suggested robbery as a way to make money.

The evidence showed that the defendant was unemployed and had very little money in his checking account in the spring of 1997. However, Linda Patton, a friend of the defendant, testified that shortly after April 23, 1997, the defendant paid half of her air fare to travel to Nashville from Texas. Patton further testified that the defendant paid cash for her meals, lodging, and entertainment in Nashville.

Additional circumstantial evidence was introduced by the prosecution. Loretto Diorio and her twelve-year-old son, Stephen, testified that they believed they saw the defendant at the Dunbar Cave park on February 17, 1997; however, they were not 100% certain. Barbara Jayroe testified that she saw the defendant at the Dunbar Cave park on April 8, 1997. She acknowledged that she told the police she was not sure the defendant was the same man she saw in the park. Mitchell Roberts testified that the defendant asked him about getting re-hired at Shoney's in late May or June of 1997. According to Roberts, the defendant was driving a small red car and was in possession of a knife with a blade about "eight or nine inches long."

Dr. Charles Harlan testified that he performed the autopsies on the two victims, Angela Holmes and Michelle Mace. Dr. Harlan testified that Holmes died as a result of a stab wound to her neck that went "all the way to her backbone." The wound, which was consistent with a knife blade of eight or nine inches, transected the carotid artery and jugular vein. Dr. Harlan testified that Mace had suffered fourteen stab wounds, including a fatal stab wound in her neck. Dr. Harlan stated that a compound incision penetrated Mace's backbone, consisted of three changes in direction, and was consistent with a sawing motion. According to Dr. Harlan, both victims would have taken five to fifteen minutes to bleed to death and would have been conscious eighty percent of that time.

Several witnesses testified for the defense in the guilt phase of the proceeding. Catherine Naylor testified that she saw a dark red or maroon car in the parking lot of Baskin-Robbins at 9:48 p.m. on April 23, 1997. According to Naylor, the car she saw did not match photographs of the defendant's car and was not a Ford Escort. Tammy Thompson and Dustin Keller, students at Austin Peay University, testified that they were at Baskin-Robbins at 9:50 p.m. on April 23, 1997, and that they were driving a 1993 red Nissan Sentra. They saw a man in Baskin-Robbins with shoulder-length hair who Thompson described as "scraggly." Both Thompson and Keller testified that defendant was not the man they saw in the store that night.

Barbara McWilliams and Martin McIntyre, employees at Riverbend Maximum Security prison in Nashville, testified that they were in the parking lot of the Dunbar Cave park between 10:50 and 11:30 p.m. on April 23, 1997. Both McWilliams and McIntyre testified that they did not see any other cars in the parking lot during that time.

Dr. William N. Shields, a professor of biology, testified for the defense as an expert in DNA analysis and zoology and disagreed with the results of the combined statistical analysis performed by LabCorp. In Shields' view, the probability that a person other than Angela Holmes was the source of the blood on the defendant's left shoe was between one in 122,000 and one in 12,000,000 in the Caucasian population. His "best estimate" was one in 1,200,000. Shields also testified that there was no reason for LabCorp to have mixed the blood stains found on the defendant's right shoe before conducting its analysis.

After considering the evidence, the jury convicted the defendant of two counts of premeditated first degree murder, two counts of felony murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. The trial court merged the two counts of felony murder with the two counts of premeditated first degree murder. A sentencing hearing was then held for the jury to determine the punishment.

## Penalty Phase

The prosecution introduced testimony from several of Angela Holmes' family members. Her husband, Tobaris Holmes, testified that his wife's murder "changed everyone's life," including their infant daughter who "would never know her mother." He believed he should have been able to protect his wife. Kim Campbell, Angela's mother, testified that she had a close relationship with her daughter and that she could no longer take family photographs because there is a "void." She further testified that the murder had "traumatized" her youngest son.

The prosecution also introduced testimony from several of Michelle Mace's family members. Craig Mace, the victim's brother, testified about the effect of his sister's murder on their family. He testified that he had become "angry, sad, and fearful," and that his father was "totally destroyed" by the killing. Connie Black, the victim's mother, likewise testified as to the impact of the killing on the family and its effect on the victim's older sister. She testified that she no longer had her "little girl anymore" and that the killing caused a "void inside her."

Dr. Charles Harlan again described the wounds suffered by Angela Holmes and Michelle Mace. Both victims had massive incisions to their throats, as well as other cuts, bruises, and abrasions. The wounds to the victims' throats had cut vital arteries and veins. The wounds were deep enough to also injure the victims' spines. Dr. Harlan repeated his guilt-phase testimony that the victims would have bled to death in five to fifteen minutes and that the victims would have been conscious and would have felt pain for eighty percent of that time. Photographs depicting the victims' injuries were identified by Dr. Harlan and shown to the jury.

Finally, the prosecution introduced evidence that the defendant had two prior convictions for first degree murder[3] and a prior conviction for especially aggravated robbery in Davidson County, Tennessee. In addition, the defendant had one prior conviction for aggravated robbery in Texas.

In mitigation, the defendant presented extensive testimony from mental health and medical experts. Dr. Xavier Amador, a clinical psychologist, testified that the defendant suffered from multiple conditions: chronic schizophrenia of the paranoid type, a cognitive disorder not otherwise specified, documented brain damage, and mental illness associated with brain dysfunction. According to Dr. Amador, the defendant also had personality change of a combined type caused by head trauma and characterized by aggressive and impulsive behavior.

Dr. Amador described the defendant's family history, behavioral problems, and history of mental illness. The defendant had a documented history of head trauma, which included several head injuries suffered in his childhood. The defendant had been diagnosed as having brain dysfunction in 1964 and 1966 and psychotic disorders in 1978 and 1984. Dr. Amador stated that the defendant believed that he has been under government surveillance since 1978:

> There are several delusions that are organized around one central delusion. He has the long-standing belief that for over twenty years, he's been under constant surveillance by a secret government agency. They videotaped him, they taped – audiotape, they bugged his car, his house. He had been chosen for this surveillance he believes because of some special qualities that he possesses. The relationship Mr. Reid has to the government agency that he believes is doing this to him is very mixed. At times, he feels tortured and . . . paranoid about this agency. At other time[s], he talks about his great loyalty to this agency. . . . And this is simply the center or the core of his delusional beliefs.

Dr. Amador did not believe the defendant was malingering; to the contrary, he stated that the defendant suffered from anosognosia, a symptom of psychosis in which a person with a brain injury compulsively attempts to prove he or she does not have a mental illness. Although the defendant "wants people to believe he is normal," Dr. Amador stated that the delusions emerged after hours of interviews:

> He would make references to things that he couldn't talk about, things he was not at liberty to say and I had to spend several hours listening to him talk about things that had nothing to do with the surveillance. But eventually, and this is over the course of the initial twenty hours of interview, I was able to document and detail and corroborate . . .

---

[3] The defendant's convictions and death sentences for these offenses have been affirmed on direct appeal. State v. Reid, 91 S.W.3d 247 (Tenn. 2002).

what other people said he used to talk about. That he was under government surveillance twenty-four hours a day.

Patricia Allen, a speech and language therapist at Vanderbilt Medical Center in Nashville, testified that she evaluated the defendant for fifteen hours in 1998. She testified that the defendant was born with a deformed ear and hearing loss. She stated that the defendant's speech and language skills were consistent with one who has had "significant acquired brain injury." She testified that the defendant had suffered at least four documented head injuries and that the injuries occurred during important developmental periods. The defendant was unable to "problem solve in integrated ways." According to Allen, the defendant scored "very poor to below average" on tests designed to measure language and reasoning skills.

Dr. Pamela Auble, a clinical neuropsychologist, testified that she interviewed the defendant, conducted testing, and reviewed the defendant's medical and social histories. She testified that the defendant had been struck in the head by his father in 1962 and that the defendant suffered additional head injuries from accidents that occurred in 1971, 1972, and 1990. Dr. Auble testified that the defendant's left temporal lobe, the area of the brain controlling language and behavior, was "shrunken and distorted." According to Dr. Auble, the brain damage caused the defendant's psychotic disorder with delusions and resulted in impairments in the defendant's behavior. Dr. Auble explained that the defendant had difficulty thinking and that he exhibited aggression, psychosis, and delusions. The defendant met the criteria for antisocial personality disorder, and he believed in a government plot to control and to kill him.

Dr. Auble testified that the defendant was not malingering. She explained that the defendant had a family history of mental illness and that documented evidence of the defendant's delusions had "been around for a long time." She testified that her testing measured whether a person is faking emotional or mental problems and that the measuring scales were not elevated when applied to the defendant.

Dr. Robert Kessler, a neurologist, testified that he examined MRI and PET scans of the defendant's brain. He described several abnormalities in the defendant's brain, including evidence of traumatic injury. Dr. Kessler explained that the folds of the left temporal lobe were shrunken and indicative of decreased function. He stated that these kinds of brain lesions cause a condition that mimics schizophrenia and bear a strong statistical association to psychotic disorders.

In rebuttal, the State offered the testimony of Dr. William Bernet, a forensic psychiatrist, who testified that he believed the defendant was malingering. Although the defendant had an antisocial personality disorder, Dr. Bernet believed the defendant had fabricated his delusions in the past. He explained:

> I think that [the defendant] has a pattern of malingering . . .
> symptoms. And by malingering what I mean is that – he at times
> makes things up. At times he fabricates symptoms. Malingering

generally means that you pretend that you have something wrong with
yourself when you really don't.

Dr. Bernet conceded that the defendant had evidence of brain damage and a history of mental problems, including delusions. Dr. Bernet further testified, however, that he "couldn't identify any relationship between [the defendant's] brain injury and the events that led to his arrest and the killing of these two women."

After deliberating, the jury imposed a death sentence for both counts of first degree murder. The jury found that three aggravating circumstances – the defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person, the murders were especially heinous, atrocious or cruel in that they involved torture or serious physical abuse beyond that necessary to produce death, and the murders were committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another – had been proven beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(i)(2), (5), (6) (2003). In addition, the jury found that the evidence of aggravating circumstances outweighed evidence of mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(c) (2003).

On appeal, the Court of Criminal Appeals affirmed the defendant's convictions and death sentences. The defendant's appeal was then automatically docketed in this Court.

**ANALYSIS**

**Competency Issues**

The defendant argues that the trial court erred in finding that he was competent to stand trial. In making this argument, the defendant specifically contends that the trial court erred by placing the burden of proof upon the defense, by excluding evidence, and by relying upon a court-appointed expert. The State asserts that the trial court correctly found that the defendant was competent to stand trial after conducting a full and fair competency proceeding.

In September of 1999, eight days before the trial was to begin, the defendant filed a motion for a determination of his competency. The trial court granted the motion and held a competency hearing over the course of three days. We begin our review of this issue by summarizing the evidence in the competency hearing.

Dr. Pamela Auble, a psychologist, testified that she examined the defendant on six occasions beginning in January of 1998. As part of her evaluation, Dr. Auble also interviewed the defendant's family members and reviewed his medical records, educational records, social histories, and other information. According to Dr. Auble, in January of 1999, the defendant told her that he had been under surveillance by the government for over thirteen years. The defendant also told Dr. Auble that the government had radiated his body with a magnetic field, which allowed his actions to be

monitored on a remote screen by the Central Intelligence Agency. According to Dr. Auble, the defendant believed that the surveillance method had been developed by the Soviet Union.

Dr. Auble testified that concerns about the defendant's competency to stand trial emerged during the defendant's prior trial for two first degree murder charges in Davidson County, Tennessee.[4] According to information Dr. Auble received from defense counsel, a jury consultant, and a defense investigator, the defendant seemed primarily concerned with his snacks and meals during the prior trial, and he did not appear to realize that he might receive a death sentence. The defendant believed that the judge, jury, and attorneys were playing roles during the trial that had been scripted. He refused to discuss that case with his attorney, and he believed jurors had been trying to make comments to him. According to Dr. Auble, the defendant also believed that fingerprint and blood evidence had been planted against him.

As a result of her earlier examination, Dr. Auble testified that the defendant was not competent to stand trial. She stated that the defendant believed that he was being monitored by the government and that his attorneys were part of a script to kill him. She stated that the defendant's brain damage from multiple injuries left the defendant unable to assist in his own defense because he could not focus on key issues; indeed, Dr. Auble noted that the defendant was preoccupied with irrelevant topics and the subjects of his delusions:

> He believes that the people in the courtroom know that he's innocent, including the District Attorney and the Judge and the policemen who interviewed him, but that nevertheless these charges have been set up. And there's a script that people play. That is being acted out. And therefore, . . . [the defendant] can not appraise the outcome of the proceedings. . . . His delusions also interfere in his ability to assist in his own defense. [The defendant's] reality is distorted. His belief that everything is predetermined at this point. That it doesn't matter if he helps his defense or not.

Dr. Auble also observed that the defendant's strong desire to appear normal resulted in his insistence that mitigating evidence not be presented in his own behalf.

On cross-examination, Dr. Auble conceded that the defendant had been diagnosed as malingering in earlier cases in Texas and that the defendant even admitted that he had "fooled the shrinks" in the late 1970s or early 1980s. She also conceded that the defendant had discussed aspects of his prior first degree murder trial with attorneys and that he had ultimately agreed to present mitigating evidence in that case.

---

[4] Dr. Auble testified on behalf of the defendant in the penalty phase of the earlier trial as well. See Reid, 91 S.W.3d at 268-69.

Dr. Xavier Amador, a psychologist, testified that he examined the defendant for over twenty hours in November of 1998. Although the defendant suffered from delusions and anosognosia, Dr. Amador initially concluded that the defendant was able to assist in his defense and was, therefore, competent for his capital murder trial held in April of 1999 in Nashville. However, as the defendant began to include his attorneys in his delusions, Dr. Amador later determined that the delusions impaired the defendant's ability to disclose relevant information and "thwart[ed]" his desire to present evidence in his own behalf. The defendant referred to one of his attorneys as "Satan," and he believed the attorneys, the prosecutors, and the trial judge were being controlled by a surveillance team with "subliminal magnetic technology." Dr. Amador stated that the defendant had an understanding of the legal process but could not apply that understanding to his own proceedings. As a result, the defendant was not competent to stand trial.

On cross-examination, Dr. Amador acknowledged that the defendant admitted he had faked delusions in the past and that other mental health professionals had determined the defendant to be malingering. Dr. Amador also conceded that the defendant agreed with defense counsel's presentation of mitigating evidence in the prior capital murder trial. Dr. Amador nonetheless testified that the defendant's IQ was in the "low average" range and that the defendant was not capable of faking mental illness.

Dr. William Bernet, a forensic psychiatrist at Vanderbilt University, testified that the defendant was competent to stand trial. Dr. Bernet met with the defendant three times, including the day before the competency hearing. He determined that the defendant suffered from antisocial personality disorder, delusional paranoia, and "a tendency to malinger." Dr. Bernet further determined, however, that the defendant was able to discuss various aspects of his case, including his refusal to accept a plea bargain because he was innocent, the prosecution's DNA evidence, and the use of mitigating proof such as his brain injuries, dyslexia, troubled childhood, and low intelligence level. He explained:

> I talked to [the defendant] about the different charges and the process; for instance, we talked about what happened in Court, who the different people are in the Court, the roles of the Defense Attorney, the Prosecuting Attorney, the witnesses, the Judge, and he seemed to have a very good understanding of how Court works. He seems to have an understanding of some of the details and not just kind of the big picture . . . .

According to Dr. Bernet, the defendant did not want to present evidence of mental illness because he did not believe he had a mental disorder. Dr. Bernet testified that the defendant was able to communicate with his attorneys, that he understood that he may be acquitted or convicted, and that he knew the possible punishments, including death by lethal injection, if he were found guilty. In sum, Dr. Bernet stated that the defendant was competent to stand trial.

Dr. Cynthia Turner-Graham, a board-certified psychiatrist who was appointed to serve as an independent expert by the trial court, testified that the defendant was competent to stand trial. She testified that the defendant understood the nature of the charges against him and believed he could present a successful alibi defense. The defendant believed he had a good working relationship with his attorneys, though they often disagreed about defense strategy. According to Dr. Turner-Graham, the defendant discussed the importance of mitigation evidence and understood that he might be sentenced to death. The defendant denied thinking that he was being watched by the government or that his trial was being scripted. He said that he "fabricated stories" to "achieve certain things at certain times." Dr. Turner-Graham testified that the defendant had an antisocial personality disorder but was "clearly competent to stand trial."

Following the competency hearing, the trial court accredited the testimony of Dr. Bernet and Dr. Turner-Graham and ruled that the defendant was competent to stand trial. The trial court emphasized the following: that the defendant understood the nature of the proceedings; that the defendant understood the nature of the charges against him and the possible punishment; that the defendant was able to assist in his defense by suggesting legal theories and strategy; and that the defendant was able to communicate with his attorneys about his trial. Although the defendant's brain injuries and related conditions made it "difficult" for him to communicate with his attorneys, the trial court found that these difficulties did not render the defendant incompetent to stand trial.

*Defendant's Competency and Burden of Proof*

The defendant argues that the trial court erred in finding that he was competent to stand trial and in placing the burden of proof upon him to establish incompetency to stand trial. The State responds that the trial court's rulings were correct.

The Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution prohibit the trial of a person who is mentally incompetent. Pate v. Robinson, 383 U.S. 375, 378 (1966); State v. Blackstock, 19 S.W.3d 200, 205 (Tenn. 2000). To be competent to stand trial, a defendant in a criminal case must have "'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)). The trial court's findings "are conclusive on appeal unless the evidence preponderates otherwise." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

As a threshold issue, we must determine who bears the burden of proof to establish a defendant's competency or incompetency. Although we have never addressed this precise issue,[5] the Court of Criminal Appeals has concluded that the burden of establishing incompetence to stand

---

[5] This Court's decisions in State v. Black, 815 S.W.2d 166 (Tenn. 1991), and Jordan v. State, 135 S.W. 327 (Tenn. 1911), did not squarely address the issue. Instead, the holding in Black upheld the trial court's decision that the defendant was competent, see Black, 815 S.W.2d at 173, and the holding in Jordan involved a plea of insanity as a defense to the charged offense. Jordan, 135 S.W. at 329.

trial rests with the defendant. Oody, 823 S.W.2d at 559.[6] In Oody, the defendant presented a clinical psychologist who testified that the defendant was borderline retarded, psychotic, and incompetent to be tried. The State, on the other hand, presented testimony from two psychologists who stated that the defendant was malingering and was competent, as well as the testimony of officers who related the defendant's ability to communicate to them. The Court of Criminal Appeals placed the burden on the defendant to establish incompetence by a preponderance of the evidence and upheld the trial court's finding that the defendant was competent to stand trial. Id. at 559-60; see also State v. Leming, 3 S.W.3d 7, 14 (Tenn. Crim. App. 1998) (applying same standard).

The Oody standard is consistent with the United States Supreme Court's holding that defendants may properly be required to establish their incompetency by a preponderance of the evidence. Medina v. California, 505 U.S. 437, 446 (1992). In Medina, the Court held that a statute requiring defendants to establish their incompetency by a preponderance of the evidence did not violate due process. In reaching that conclusion, the Court observed:

> Based on our review of the historical treatment of the burden of proof in competency proceedings, the operation of the challenged rule, and our precedents, we cannot say that the allocation of the burden of proof to a criminal defendant to prove incompetence "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."

Id. (quoting Patterson v. New York, 432 U.S. 197, 202 (1977)). Moreover, the Court emphasized that "[o]nce a State provides a defendant access to procedures for making a competency evaluation, . . . we perceive no basis for holding that due process further requires the State to assume the burden . . . of persuading the trier of fact that the defendant is competent to stand trial." Id. at 449.

In contrast, the United States Supreme Court has invalidated an Oklahoma statute that required defendants to prove their incompetency by clear and convincing evidence. Cooper v. Oklahoma, 517 U.S. 348, 369 (1996). In reaching its holding, the Court observed that forty-six states and the federal government either required the prosecution to establish a defendant's competency or required defendants to establish incompetency by a preponderance of the evidence. Id. at 360-62. The Court further emphasized that the "clear and convincing evidence standard affects a class of cases in which the defendant has already demonstrated that he is more likely than not incompetent." Id. at 364.

---

[6] A variety of approaches are taken in other jurisdictions. Many place the burden of proof on the defendant to establish his or her incompetency either by statute or case law. See Colo. Rev. Stat. Ann. § 16-8-111; Conn. Gen. Stat. Ann. § 54-56d; Mo. Ann. Stat. § 552.020; Pa. Cons. Stat. Ann. tit. 50, § 7403; R.I. Gen. Laws § 40.1-5.3-3; Utah Code Ann. § 77-15-5; Va. Code Ann. § 19.2-169.1; State v. Kleypas, 40 P.3d 139 (Kan. 2001), overruled on other grounds by State v. Marsh, 102 P.3d 445 (Kan. 2004). Others place the burden on the prosecution. See Ill. Comp. Stat. Ann. ch. 725 § 5/104-11; S.D. Codified Laws § 23A-10A-6.1; Wis. Stat. Ann. § 971.14.

We have reviewed the approaches taken in other jurisdictions, and in our view the better reasoned choice is the standard that requires defendants to establish their incompetency by a preponderance of the evidence. This standard was identified by the Court of Criminal Appeals in 1991, and it has been applied since that time with no apparent difficulty or prejudice to either the defense or the prosecution. Oody, 823 S.W.2d at 559; Leming, 3 S.W.3d at 14. Indeed, placing the preponderance burden on defendants appears to strike an appropriate balance in several respects:

> After balancing the equities . . . the burden of proof may constitutionally rest on the defendant. . . . The main concern of the prosecution . . . is that a defendant will feign incompetence in order to avoid trial. If the burden of proving incompetence rests on the government, a defendant will have less incentive to cooperate in psychiatric investigations. . . . A defendant may also be less cooperative in making available friends or family who might have information about the defendant's mental state. States may therefore decide that a more complete picture of a defendant's competence will be obtained if the defense has the incentive to produce all the evidence in its possession.

Medina, 505 U.S. at 455 (O'Connor, J., concurring). Finally, the preponderance of the evidence standard is consistent with due process. Id. at 446.

In applying these principles to this case, we conclude that the evidence in the record does not preponderate against the trial court's finding that the defendant was competent to stand trial.[7] The trial court held an exhaustive evidentiary hearing and considered the expert testimony of Dr. Auble, Dr. Amador, Dr. Bernet, and Dr. Turner-Graham. The trial court found that the defendant suffered from a brain injury and had difficulties communicating at times. The trial court further found, however, that the defendant understood the nature of the proceedings, understood the charges against him, and communicated with his attorneys by suggesting defenses. The fact that not all of the defendant's defense strategies or suggestions were pursued does not indicate that he lacked the ability to assist in his defense. In short, the trial court heard the evidence and accredited the testimony of Dr. Bernet and Dr. Turner-Graham. After carefully reviewing the record, we conclude that the evidence does not preponderate against the trial court's finding that the defendant was competent to stand trial.

---

[7] Indeed, we note that the trial court, out of an abundance of caution, evaluated the evidence and reached the same conclusion under two separate standards: placing the burden on the defendant to establish incompetency by a preponderance of the evidence and placing the burden on the State to establish competency by a preponderance of the evidence.

In a related issue on competency, the defendant argues that the trial court erred in excluding the testimony of Reverend Joe Ingle, a minister who had visited with the incarcerated defendant, and the testimony of Mary Ann Hea, a social worker for the public defender's office who had interviewed the defendant several times. The defendant maintains that these witnesses would have supported his claim of incompetency. The State argues that the trial court did not err in excluding these witnesses because the defendant asserted applicable privileges that prevented them from testifying.

The record shows that the defense called Reverend Ingle to testify at the competency hearing. According to defense counsel, Ingle would have testified that he met with the defendant on numerous occasions and that the defendant often tried to portray himself as normal. Ingle would have further testified that the defendant had bizarre, delusional thoughts and that the defendant was the most mentally ill prisoner he had ever counseled. The trial court refused to allow Ingle to testify, however, because the defendant declined to waive the clergy-penitent privilege. See Tenn. Code Ann. § 24-1-206 (2000).

Similarly, the record shows that the defense called Mary Ann Hea during the competency hearing to testify about her numerous interviews with the defendant as a social worker for the public defender. After determining that Hea was part of the defense team, the trial court refused to allow her to testify because the defendant declined to waive the applicable privilege, i.e., the attorney-client privilege.

In our view, the trial court did not err in excluding the testimony. First, our conclusion that a defendant bears the burden of establishing his or her incompetency necessarily means that he or she has not been found to be incompetent before or during the competency proceeding itself. As a result, nothing prevents a defendant from invoking an applicable privilege during a competency proceeding as a matter of law. Moreover, the trial court is free to reconsider the issue of the defendant's invocation of privileges while evidence of the defendant's mental status is presented during the hearing by both the defense and prosecution.

Second, a defendant's right to present evidence to meet the burden of proof does not eliminate the trial court's discretion in determining relevance and materiality of the evidence. Here, the defendant presented extensive expert testimony to show that he was not competent to stand trial. The expert witnesses related the basis of their opinions, which included analysis of the defendant's family background, history of head injuries, and mental illness. Dr. Auble, for instance, testified that evidence was gathered not only from the defendant but also the defendant's attorneys, jury consultant, and investigators. Dr. Auble and Dr. Amador testified effectively on behalf of the defense; Dr. Bernet and Dr. Turner-Graham likewise testified fully and effectively on behalf of the prosecution. In sum, the defendant's exercise of his privileges did not prevent the trial court from fully considering the material evidence and making a thorough assessment of the relevant issues

pertaining to the defendant's competency to stand trial. Accordingly, we conclude that the trial court did not err in excluding the testimony of the witnesses.

*Competency and the Court-Appointed Expert*

The defendant next argues that the trial court erred in denying his motion for a new competency proceeding on the ground that the court-appointed expert, Dr. Cynthia Turner-Graham, allegedly knew one of the victims. The State maintains that there was no evidence establishing that Dr. Turner-Graham had a conflict of interest or that the defendant was prejudiced in any way.

As part of a motion for a new trial, the defendant introduced the affidavit of an Assistant Public Defender, Gary C. Tamkin. The affidavit stated that Tamkin and Dr. Turner-Graham were friends and that the latter had told him "she believed she had met one of the victims." According to Tamkin's affidavit, Dr. Turner-Graham said that her son knew one of the victims and that the victim had been to her house.

In denying the motion for new trial, the trial court found it "inconceivable" that an assistant public defender in possession of such information would wait until after trial to reveal it to his colleagues. The trial court further noted that the defense had presented no testimony in support of the issue and had failed to establish "when, how well, or for how long" Dr. Turner-Graham knew one of the victims. The Court of Criminal Appeals upheld the trial court's ruling.

In our view, the record supports the trial court's ruling. The defendant failed to show that Dr. Turner-Graham had a conflict of interest or that her testimony was affected by allegedly meeting one of the victims. The defendant failed to produce any facts with regard to Dr. Turner-Graham's knowledge of the victim and failed to establish any prejudice resulting from Dr. Turner-Graham's testimony. Moreover, the record reveals that the trial court conducted a full and fair competency proceeding and fully considered the extensive evidence presented by both the defendant and the prosecution. We conclude that the trial court did not err in denying the motion for a new trial and a new competency hearing.

**Guilt Phase Issues**

*Sufficiency of Evidence*

The defendant argues that there was insufficient evidence of premeditation and deliberation to support the first degree murder convictions. The State maintains that the evidence was sufficient to support the convictions.

When evaluating the sufficiency of the evidence, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). We are required to afford the

prosecution the strongest legitimate view of the evidence in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions concerning the credibility of the witnesses, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the trier of fact. Id.; see also State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). Moreover, these principles of review apply even if a conviction is based upon circumstantial evidence. State v. Cole, 155 S.W.3d 885, 897 (Tenn. 2005).

The offense of first degree murder includes a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). A premeditated act is "an act done after the exercise of reflection and judgment" and means that "the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d) (2003). An intentional act refers to "the nature of the conduct or to a result of the conduct when it is [a] person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18) (2003).

In Bland, we identified and discussed circumstances that, if established by the proof, may warrant the trier of fact to find or infer premeditation. The circumstances include the use of a deadly weapon upon an unarmed victim, the particular cruelty of a killing, any threats or declarations of intent to kill made by the defendant, proof that the defendant procured a weapon, any preparations to conceal the crime undertaken before the crime is committed, and the defendant's calm demeanor immediately after a killing. Bland, 958 S.W.2d at 660.

We agree with the Court of Criminal Appeals' conclusion that the evidence was sufficient to support the first degree murder convictions. There was extensive evidence connecting the defendant to the crimes: the defendant was near the Baskin-Robbins store at approximately the time the two victims had been closing the store on April 23, 1997; several witnesses saw a red car similar to the defendant's car; and credit card receipts revealed that the defendant had purchased gasoline at a Texaco station that was minutes away from Baskin-Robbins. There was also extensive evidence connecting the defendant to the victims: the defendant or his car had been seen at or near the Dunbar Cave area in which the victims' bodies were found; blood found on the defendant's left shoe had a DNA profile that was consistent with that of Angela Holmes; blood found on the defendant's right shoe had a DNA profile that did not exclude the defendant or the victims; and fibers found on the clothing of Holmes and Michelle Mace were consistent with fibers found in the defendant's car. Finally, there was evidence that the defendant had acted with intent and with premeditation: the victims had suffered deep, penetrating stab wounds to their throats; the stab wounds had been inflicted with enough force to penetrate the victims' spines; the stab wounds had been inflicted with a knife blade several inches long; and the victims bled to death in a secluded area. See State v. Keough, 18 S.W.3d 175, 181 (Tenn. 2000) (upholding a finding of premeditation based on the nature of the killing where a defendant stabbed the victim to death with a large knife).

The defendant characterizes the evidence as circumstantial and emphasizes inconsistent statements made by witnesses, inconsistent descriptions of the defendant's car, and other alleged discrepancies in the evidence. However, it is the jury's function to weigh the credibility of the

-17-

witnesses and to resolve the factual conflicts in the evidence. Our task is to review the legal sufficiency of the evidence under the standards stated above.

Accordingly, we conclude that the evidence was sufficient to support the two convictions for first degree murder. Similarly, we conclude that the evidence was sufficient to support the defendant's convictions for especially aggravated kidnapping, see Tenn. Code Ann. § 39-13-305(a) (2003), and especially aggravated robbery. See Tenn. Code Ann. § 39-13-403(a) (2003).

*Motion to Dismiss Indictment*

The defendant asserts that the trial court erred in failing to dismiss the indictment because the indictment did not charge the aggravating circumstances used to seek the death penalty. The defendant, citing Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring v. Arizona, 536 U.S. 584 (2002), argues that aggravating circumstances must be charged in the indictment, submitted to the jury, and established beyond a reasonable doubt. The State maintains that Tennessee's capital sentencing scheme does not require aggravating circumstances to be charged in the indictment.

In Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In Ring, the Supreme Court addressed the capital sentencing scheme in Arizona, under which guilt or innocence was determined by a jury and the presence of aggravating factors required for the imposition of the death penalty was determined by a trial judge. Relying on Apprendi's holding that the *Sixth Amendment* required a jury determination of any facts that would expose a defendant to a penalty exceeding the maximum, the Court found Arizona's scheme unconstitutional. Ring, 536 U.S. at 609. As in Apprendi, however, the Court did not apply the *Fifth Amendment* right to presentment or grand jury indictment; instead, the Court reiterated that the Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury.'" Ring, 536 U.S. at 597 n.4 (quoting Apprendi, 530 U.S. at 477 n.3).

As the parties recognize, this Court has consistently held that Apprendi does not affect capital sentencing in Tennessee and does not require aggravating circumstances to be pled in an indictment. See State v. Leach, 148 S.W.3d 42, 59 (Tenn. 2004); State v. Berry, 141 S.W.3d 549, 562 (Tenn. 2004); State v. Holton, 126 S.W.3d 845, 863 (Tenn. 2004); State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002). In addition, we have clarified that Ring, as well as the more recent decision in Blakely v. Washington, 124 S. Ct. 2531 (2004), "do not change our analysis . . . regarding whether aggravating circumstances must be pled in the indictment." Berry, 141 S.W.3d at 560; State v. Davis, 141 S.W.3d 600, 616 (Tenn. 2004). As we explained in Berry, "[t]he focus in Apprendi, Ring, and Blakely was on the Sixth Amendment right to trial by jury," and "the Court expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the

States." Berry, 141 S.W.3d at 560.[8] Moreover, we emphasized that defendants in capital cases receive written notice of the State's intent to seek the death penalty prior to trial, as well as written notice of the aggravating circumstances, under Rule 12.3 of the Tennessee Rules of Criminal Procedure. Id. at 562.

In short, we have held repeatedly that Tennessee's capital sentencing scheme does not require that aggravating circumstances be included in an indictment. The defendant's arguments, therefore, are without merit.

*Amendment of the Indictment*

The defendant also argues in a related indictment issue that the trial court erred in allowing the indictment to be amended to change the predicate felony underlying the two counts of felony murder from "especially aggravated robbery" to "robbery." The State responds that the trial court did not err because the amended indictment did not include a new or different charge.

We conclude that the trial court did not err in allowing the State to amend the indictment. First, an indictment may be amended without the defendant's consent before jeopardy attaches if "no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced." Tenn. R. Crim. P. 7(b). Second, the indictment initially charged that two counts of felony murder occurred in the course of "especially aggravated robbery"; the amendment stated that the two counts of felony murder occurred during the course of "robbery," which is simply a lesser included offense of "especially aggravated robbery." Tenn. Code Ann. §§ 39-13-401; -403 (2003). As a result, no new or different offenses were alleged; to the contrary, the amended indictment, like the original indictment, charged two counts of felony murder pursuant to Tennessee Code Annotated section 39-13-202(a)(2).

The defendant also argues that he was prejudiced because the amended indictment no longer required the State to prove the elements of especially aggravated robbery. We disagree. The State was required by the amended indictment to prove the required elements of the charged offenses, i.e., felony murder. Because the amended indictment did not charge new or different offenses, see Tenn. R. Crim. P. 7(b), the defendant had notice of the charges and their required elements. State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000) (stating that notice is the purpose of an indictment). Finally, the defendant's convictions for two counts of felony murder were merged with his convictions for two counts of premeditated first degree murder. In sum, the trial court did not err, and the defendant is entitled to no relief on this ground.

---

[8] Furthermore, we noted that the majority of states have likewise declined to require the inclusion of aggravating circumstances in the indictment. Berry, 141 S.W.3d at 561 n.4.

*Extrinsic Evidence of Prior Inconsistent Statements*

The defendant contends that the trial court erred in excluding extrinsic evidence of inconsistent statements offered during the testimony of Sgt. R. W. Knight to impeach two of the State's witnesses. See Tenn. R. Evid. 613(b). The State responds that the trial court did not abuse its discretion and that any error was harmless.

We begin our review of this issue by summarizing the relevant portions of the transcript. The defense questioned the State's witness, Sgt. R. W. Knight, about statements made to him by a witness for the prosecution, Jay Smith. Although Smith had testified that he saw a car similar to the defendant's at Dunbar Cave on the night of April 23, 1997, and said that he did not recall contacting the police, Sgt. Knight testified that Smith had called the police on May 1, 1997, to provide the license number of a car he had seen at Dunbar Cave. Sgt. Knight further testified that the license number provided by Smith did not belong to the defendant.

Similarly, the defense questioned Sgt. Knight about prior statements made by another witness for the prosecution, Lavanda Zimmerman. Zimmerman had testified that she saw a car similar to the defendant's in the Baskin-Robbins parking lot on the night of April 23, 1997, but said that police officers did not ask her whether she had seen any cars at that time. Sgt. Knight testified, however, that the police asked Zimmerman whether any cars had been in the parking lot.

The trial court denied the defendant's request to introduce Sgt. Knight's written summaries of the interviews with Smith and Zimmerman, even though the defendant had asked Sgt. Knight about the witnesses' statements and had properly moved that the summaries be admitted into evidence during Sgt. Knight's testimony. The trial court concluded that evidence of a prior inconsistent statement may be introduced only by either (1) using a second witness to relate the prior inconsistent statements or (2) using extrinsic evidence of the prior statement during the examination of the witness who is being impeached. The Court of Criminal Appeals held that the trial court did not abuse its discretion because Sgt. Knight's written summaries were cumulative to his testimony in court.

Extrinsic evidence of a witness's prior inconsistent statement "is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Tenn. R. Evid. 613(b). The Advisory Commission Comments to Rule 613(b) clarify that the "only requirement" for the use of extrinsic evidence is that the witness must be "afforded an opportunity to explain or deny."[9] The extrinsic evidence may be "the written or recorded content of the prior statement itself or the testimony of another witness as to the content of the prior written or oral statement." Neil Cohen et al., Tennessee Law of Evidence, § 613.4 (4th ed. 2003).

---

[9] An additional limitation, however, is that extrinsic evidence may not be used where the trial court determines that the extrinsic evidence concerns a collateral matter. Neil Cohen et al., Tennessee Law of Evidence, § 613.5 (4th ed. 2003).

In our view, the trial court erred in concluding that the defendant could not introduce the written summaries of the statements made by Smith and Zimmerman to Sgt. Knight. Rule 613(b) requires only that the witnesses be given an opportunity to explain or deny their prior statement. This requirement was met during the defense's cross-examination of Smith and Zimmerman during the State's proof regarding their prior statements. Moreover, Rule 613(b) does not expressly limit the impeaching party to one form of extrinsic evidence, nor does it require an impeaching party to choose between two available forms of extrinsic evidence. In short, the trial court's ruling, which limited the defense to the use of the testimony of Sgt. Knight and precluded the use of the witnesses' statements, was erroneous under Rule 613(b).

We also conclude, however, that the trial court's error did not affect the result of the proceeding. The defendant attempted to elicit inconsistencies between Smith and Zimmerman's in-court testimony and their prior statements. The defendant asked both Smith and Zimmerman about their prior statements on cross-examination; thus, both witnesses were given an opportunity to explain or deny their statements. The defense then used Sgt. Knight's testimony as extrinsic evidence of the prior inconsistent statements made by Smith and Zimmerman. Although there were written summaries of the witnesses' prior statements, the defense did not establish that the written summaries would have been more effective than Sgt. Knight's testimony or otherwise critical to the defense. In sum, the trial court's error was harmless, and the defendant, therefore, is not entitled to relief on this issue.

**Penalty Phase Issues**

*Sufficiency of Aggravating Circumstances*

The defendant contends that the evidence was insufficient to support the jury's application of the "heinous, atrocious, or cruel" aggravating circumstance set forth in Tennessee Code Annotated section 39-13-204(i)(5) (2003). The State maintains that the evidence was sufficient to support the jury's application of this aggravating circumstance.

Our analysis requires that we determine whether, after viewing the evidence in a light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. Terry v. State, 46 S.W.3d 147, 160-61 (Tenn. 2001). Although the defendant has challenged only one of the three aggravating circumstances in this case, we will address each in turn. See Tenn. Code Ann. § 39-13-206(c)(1)(B) (2003) (requiring review of aggravating circumstances found by the jury).

1. Tennessee Code Annotated section 39-13-204(i)(2)

The aggravating circumstance found in Tennessee Code Annotated section 39-13-204(i)(2) (2003) is as follows: "The defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person[.]" The plain statutory language requires the prosecution to prove that the defendant had (1) a prior

conviction, (2) for a felony offense, (3) whose statutory elements involved the use of violence to a person.  Davis 141 S.W.3d at 618.

In this case, the prosecution established this aggravating circumstance by relying on the defendant's prior convictions in Tennessee for two counts of first degree murder and one count of especially aggravated robbery.  These three convictions were clearly felony offenses whose statutory elements involved the use of violence to the person.  See Tenn. Code Ann. §§ 39-13-202(a); -403. The prosecution also relied on the defendant's prior conviction in Texas for the offense of aggravated robbery, which the parties stipulated was a violent felony.

Accordingly, the evidence was sufficient to support the jury's application of this aggravating circumstance beyond a reasonable doubt.

### 2.  Tennessee Code Annotated section 39-13-204(i)(5)

The aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(5) applies where the "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."  The defendant argues that this aggravating circumstance should not have been applied because the facts of this case were not as severe or aggravated as other cases in which this aggravating circumstance has been applied.

"Torture" has been defined as "the infliction of severe mental or physical pain upon the victim while he or she remains alive and conscious."  State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). "Serious physical abuse beyond that necessary to produce death" has been defined as follows:

> The word "serious" alludes to a matter of degree.  The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death."  "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996) (quoting Black's Law Dictionary 11 (6th ed.1990)); see also State v. Morris, 24 S.W.3d 788, 797 (Tenn. 2000).

In this case, the evidence supports a finding of torture and serious physical injury beyond that necessary to produce death.  Both victims were stabbed multiple times.  Both victims were stabbed in the throat or neck with such severe force that the murder weapon penetrated bone; indeed, the wounds inflicted on Michelle Mace included five cuts to her vertebral column as a result of a "sawing" motion.  Both victims were alive and conscious for five to fifteen minutes as they bled to death in great pain.  In sum, the evidence was sufficient to support the jury's application of this aggravating circumstance beyond a reasonable doubt.  See State v. Mann, 959 S.W.2d 503, 511 (Tenn. 1997) (victim beaten, strangled, and stabbed eleven times).

The aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(6) applies where a "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Section 204(i)(6) focuses on a defendant's motives in committing a murder, and it is not limited to the killings of eyewitnesses or those witnesses who know or can identify the defendant. See Terry, 46 S.W.3d at 162. Moreover, the defendant's desire to avoid arrest or prosecution need not be the sole motive for killing the victim and instead may be just one of the purposes motivating the defendant to kill. Id.; see also Davis, 141 S.W.3d at 618-19.

Here, the victims were robbed, kidnapped, taken to a remote area, stabbed, and abandoned. The evidence supported a finding that one of the defendant's purposes in committing the murders was to avoid arrest or prosecution for the robbery and kidnapping offenses. Accordingly, the evidence was sufficient to support the jury's application of this aggravating circumstance beyond a reasonable doubt.

*Proportionality*

Where a defendant has been sentenced to death, we must apply a comparative proportionality analysis pursuant to Tennessee Code Annotated section 39-13-206(c)(1)(D) (2003). The analysis identifies aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)).

In conducting this analysis, this Court employs the precedent-seeking method of comparative proportionality review, in which we compare a case with other cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 665-67. While no defendants or crimes are alike, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668.

We have repeatedly held that the pool of cases considered by this Court in its proportionality review includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. See State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001). We have explained that the pool does not include first degree murder cases in which a plea bargain is reached with respect to the punishment or in which the State does not seek the death penalty:

> [C]onsideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. We previously have declined to review the exercise of prosecutorial

> discretion, and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases.

Id. at 784 (citations omitted) (emphasis added).

Accordingly, our comparative proportionality review of the applicable pool of cases considers numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. Bland, 958 S.W.2d at 667. We also consider numerous factors about the defendant: (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id.; see also State v. Bane, 57 S.W.3d 411, 428-29 (Tenn. 2001).

In this case, we begin by reviewing the nature of the offenses. The defendant robbed and kidnapped the victims in Clarksville, Tennessee, on April 23, 1997. The defendant drove the victims to a secluded area and stabbed them to death. The victims suffered deep, penetrating stab wounds to their throats. The stab wounds had been inflicted with a knife blade several inches long with enough force to penetrate their spines. The victims were alive five to fifteen minutes after being stabbed and were conscious for eighty percent of that time as they bled to death. The defendant's conduct was intentional and premeditated. He acted alone in these offenses, without any evidence of provocation or justification.

We next consider evidence regarding the defendant and his background. The defendant was unemployed at the time of these offenses, and he had prior convictions for first degree murder, especially aggravated robbery, and robbery. He also had a history of mental illness and brain damage stemming from a number of head injuries. Dr. Xavier Amador testified that the defendant suffered from chronic schizophrenia of the paranoid type, a cognitive disorder, documented brain damage, and mental illness characterized by aggressive and impulsive behavior. Dr. Pamela Auble testified that the defendant's brain damage caused the defendant's significant mental disorders and resulted in pervasive impairments in the defendant's behavior, that the defendant had difficulty thinking, exhibited aggression, psychosis, and delusions, and that he believed he was under government surveillance and control. Dr. Robert Kessler testified that the defendant had several brain abnormalities, including traumatic brain injuries, that bore a strong statistical association to psychotic disorders. Although mental health professionals testified that the defendant was schizophrenic and delusional, there was also evidence regarding the defendant's history of malingering. Finally, no evidence was presented to show that the defendant cooperated with the authorities, exhibited remorse for the killings, or was amenable to rehabilitation.

-24-

For the following reasons, we conclude that the death sentence as applied to the defendant in this case was not excessive or disproportionate when compared to defendants in other cases. See Tenn. Code Ann. § 39-13-206(c)(1)(A), (C), (D) (2003).

First, this Court has upheld death sentences in numerous similar cases where the defendant stabbed a victim or victims. See Leach, 148 S.W.3d at 42; Keough, 18 S.W.3d at 183; State v. Bush, 942 S.W.2d 489 (Tenn. 1997); State v. Hines, 919 S.W.2d 573 (Tenn. 1995); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989); State v. West, 767 S.W.2d 387 (Tenn. 1989). In several of these cases, like the present case, a victim was stabbed to death in the course of a robbery or other felony. Leach, 148 S.W.3d at 60; Bush, 942 S.W.2d at 507; Hines, 919 S.W.2d at 584; West, 767 S.W.2d at 397.

Second, this Court has upheld numerous death sentences in cases involving a defendant with prior convictions for felonies whose statutory elements involved the use of violence to the person, i.e., one of the aggravating circumstances applied by the jury in this case. See, e.g., Leach, 148 S.W.3d at 60. As this Court often has said, this aggravating circumstance is "more qualitatively persuasive and objectively reliable than other[]" aggravating circumstances. State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993).

Likewise, we have upheld the death penalty in similar cases involving the other two aggravating circumstances applied in this case, i.e., the murder was heinous, atrocious or cruel in that it involved torture or serious injury beyond that necessary to produce death, and the murder was committed to avoid or prevent the defendant's arrest or prosecution. Leach, 148 S.W.3d at 59 (aggravating circumstance (i)(5)); Bush, 942 S.W.2d at 504-05 (aggravating circumstances (i)(5) and (6)); Hines, 919 S.W.2d at 584 (aggravating circumstance (i)(5)); Thompson, 768 S.W.2d at 252 (aggravating circumstances (i)(5) and (i)(6)).

Finally, we have upheld sentences in numerous cases involving defendants who presented similar evidence of mitigating circumstances. For example, several cases have involved defendants who presented evidence of their family backgrounds or poor childhood environments. Davis, 141 S.W.3d at 621; State v. Middlebrooks, 995 S.W.2d 550, 552 (Tenn. 1999); Hines, 919 S.W.2d at 573. Similarly, several similar cases have involved defendants with mental illness. Middlebrooks, 995 S.W.2d at 552 (defendant with borderline personality disorder and brain impairment); Hines, 919 S.W.2d at 573 (defendant with paranoid personality disorder, dysthymia, and chronic depression); Cazes, 875 S.W.2d at 259 (defendant with possible neurological damage); Smith, 868 S.W.2d at 561 (defendant with chronic depression, paranoid personality disorder, chronic depressive neurosis, and paranoid delusional disorder); Howell, 868 S.W.2d at 262 (defendant with brain damage).

We need not find that this case is exactly like a prior case in every respect, nor must we determine that this case is "more or less" like other similar death penalty cases. Instead, we must identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. Accordingly,

for the foregoing reasons, the death sentences imposed on the defendant for the first degree murder offenses in this case are not disproportionate.

*Weighing of Aggravating and Mitigating Circumstances*

As explained above, the evidence overwhelmingly supported three aggravating circumstances applied by the jury: that the defendant had previous convictions for felonies whose elements involved violence to the person; that the murders were especially heinous, atrocious or cruel in that they involved torture or physical abuse beyond that necessary to produce death; and the murders were committed by the defendant to avoid arrest or prosecution. The mitigating circumstances included testimony about the defendant's background, head injuries, brain damage, mental illness, and belief that he was under government surveillance.

After reviewing the record and considering the evidence discussed above with regard to proportionality, we conclude that the evidence supported the jury's finding that the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(C) (2003).

*Capital Sentencing – Rights to Due Process and Confrontation*

The defendant argues that Tennessee's capital sentencing scheme violates his rights to due process and confrontation under the United States Constitution because the rules of evidence do not apply and the jury is permitted to hear evidence that is not reliable and trustworthy. See Tenn. Code Ann. § 39-13-204(c) (rules of evidence not applicable during penalty phase). The State responds that the defendant's argument is without merit.

We have recently rejected the argument raised by the defendant. In Berry, we observed that under Tennessee Code Annotated section 39-13-204(c), evidence that is relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment. Berry, 141 S.W.3d at 563-64. Although the statute gives wider discretion to the trial court than normally permitted under the Tennessee Rules of Evidence, we explained:

> [T]he discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

Id. (quoting State v. Sims, 45 S.W.3d 1, 14 (Tenn. 2001)).

Accordingly, the standards set forth in Tennessee Code Annotated section 39-13-204(c) allow trial courts to exclude evidence that may violate the constitutional guarantees of due process or confrontation. The defendant's argument, therefore, is without merit.

*Admissibility of Photographs*

The defendant argues that the trial court erred in admitting photographs of the victims during the penalty phase of the trial. The defendant contends that the photographs of the victims taken at the crime scene were gruesome and intended to inflame the passions of the jury. The State maintains that the trial court properly admitted the photographs in support of an aggravating circumstance.

A trial court is afforded broad discretion in determining whether to admit photographs of the deceased in a murder prosecution. State v. Odom, 137 S.W.3d 572, 588 (Tenn. 2004); State v. Morris, 24 S.W.3d 788, 810-11 (Tenn. 2000). The decision to admit photographs will be reversed only if the trial court has abused its discretion. Odom, 137 S.W.3d at 588.

The record shows that the trial court admitted one photograph of each victim at the crime scene. The color photographs showed the deep stab wounds inflicted on the victims' necks. The trial court concluded that the photographs were probative in establishing an aggravating circumstance, i.e., the murders were heinous, atrocious or cruel in that they involved torture or physical abuse beyond that necessary to produce death, and that the probative value of the photographs outweighed the risk of unfair prejudice.

In our view, the trial court did not abuse its discretion. The photographs were relevant to establish an aggravating circumstance and were not introduced for the purpose of inflaming the jury. Though graphic, the photographs were not unduly gruesome or unfairly prejudicial. Morever, the trial court allowed the admission of only one photograph of each victim to depict the nature and extent of the injuries inflicted by the defendant. Accordingly, the trial court did not abuse its discretion in admitting the crime scene photographs of the victims.

*Failure to Instruct Jury on "Catch-all" Mitigating Provision*

The defendant argues that the trial court erred in failing to instruct the jury on the "catch-all" mitigating circumstance set out in Tennessee Code Annotated section 39-13-204(j)(9). This statute allows the jury to consider "[a]ny other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing." Id. The State responds that the trial court and the Court of Criminal Appeals properly held that the issue was waived because the defendant did not object or include the issue in the motion for new trial.

The record shows that the trial court instructed the jury on numerous statutory and non-statutory mitigating circumstances. Tenn. Code Ann. § 39-13-204(j). The non-statutory mitigating

circumstances charged to the jury included the defendant's "history of childhood," "mental illness or emotional disturbance," and "brain injury or damage." Although the defendant correctly asserts that the trial court failed to instruct the jury on the "catch-all" provision noted above, the transcript shows that the trial court gave the following instruction:

> Tennessee law provides that in arriving at the punishment, the jury shall consider as previously indicated, any mitigating circumstances raised by the evidence in the guilt-finding phase, the sentencing phase, or both, which shall include, <u>but are not limited to</u>, the following: [specific statutory and non-statutory mitigating circumstances]. No distinction shall be made between the mitigating circumstances listed and those otherwise raised by the evidence.

The defendant did not object to the instructions, nor did the defendant include this issue in his motion for a new trial.

Although a trial court must instruct the jury on the statutory mitigating "catch-all" provision, the omission in this case was not plain error. The trial court instructed the jury on statutory and non-statutory mitigating circumstances that could be considered. The trial court also instructed the jury that mitigating circumstances were "not limited to" the specific statutory and non-statutory factors. In sum, the trial court's instructions as a whole encompassed the statutory "catch-all" provision and informed the jury that it could consider any mitigating circumstances raised by the evidence in the guilt and penalty phases of the trial. Accordingly, the trial court's failure to instruct on the statutory mitigating "catch-all" provision did not affect the substantial rights of the defendant and was not plain error. Tenn. R. Crim. P. 52(b).

*Prosecutorial Misconduct in Penalty Phase*

The defendant next contends that the trial court erred in failing to grant a new sentencing hearing due to prosecutorial misconduct during closing argument. The defendant argues that the prosecutor's misconduct included referring to a victim's thoughts, appealing to the jury's passion, using crime-scene photos of the victims on a projector, and telling the jury that the defendant had murdered four people in "cold blood." The State responds that there was no prosecutorial misconduct and that the defendant failed to object to many of the prosecutor's statements.

This Court has often observed that "closing argument is a valuable privilege that should not be unduly restricted." Bane, 57 S.W.3d at 425. We have likewise recognized that the prosecutor may not engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991) (referring to defendant as a "rabid dog"). The trial court has discretion in controlling the course of arguments and will not be reversed absent an abuse of that discretion. Bane, 57 S.W.3d at 424.

Moreover, prosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome of the case to the prejudice of the defendant. See State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000). In making this determination, we must consider: (1) the conduct complained of viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. Id. at 917; State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). We will review each of the defendant's arguments with these standards in mind.

The defendant asserts that the prosecutor improperly referred to the thoughts Angela Holmes may have had before she died. The record shows that the prosecutor argued that the victim may have been thinking about her family or her wedding, which had taken place at Dunbar Cave, and that "we can only speculate as to what she was thinking." Although counsel are required to confine their arguments to those supported by the evidence or inferences drawn from the evidence, the defendant did not object to the prosecutor's remarks at trial. Thus, we cannot conclude either that the trial court abused its discretion in allowing the argument or that the prosecutor's argument affected the outcome of the trial.

The defendant next argues that the prosecutor engaged in misconduct by using dollar bills to demonstrate the defendant's greed. In denying the motion for new trial, the trial court observed that the prosecutor had asked, "why did this man do this," and had then placed money on a projector while stating, "that's why." The trial court found that the argument had been made in response to the argument that the defendant should not be sentenced to death because of his mental illness. The record shows that the defense did not object to the argument or the prosecutor's conduct at trial. After reviewing the trial court's findings and the record, we cannot conclude that the trial court abused its discretion or that the prosecutor's argument affected the result of the trial.

The defendant argues that the prosecutor engaged in misconduct by placing the crime scene photographs of the victims on a projector. The record shows that the prosecutor stated:

> This is not some crazy offense. This is standard greed. He'd rather kill and rob [than] work. And that's what he did; he killed and robbed, and turned two beautiful little children into this. And it wasn't because of his mental illness or his mother or his father. Because he wanted money.

The record does not, however, reveal the prosecutor's precise actions while making these arguments. Moreover, the defendant did not object to the prosecutor's conduct or make an offer of proof to preserve the record for appellate review. As a result, we cannot conclude that the trial court abused its discretion in allowing the argument or that any misconduct affected the outcome of the trial.

Finally, the defendant argues that the prosecutor engaged in misconduct by making references to the underlying facts of the defendant's prior first degree murder convictions. The record shows

-29-

that the prosecutor stated that the two victims in this case were "the third and fourth persons" the defendant had killed, that the defendant had now killed "four" people, and that the defendant had killed four people "in cold blood." The defendant did not object to the arguments, however, until the prosecutor stated: "I submit to you the fact that this is the third and fourth person he's murdered, that's powerful enough to blow away any mitigating evidence." At that point, the trial court sustained the defendant's objection and instructed the jury to disregard the argument. The trial court later instructed the jury as follows:

> In its closing argument, the State may have implied that the jury should impose death because the defendant has been convicted of killing four people. The defendant has been tried, convicted and sentenced for his prior convictions. You are to consider those convictions only for the purpose of determining whether the State has proven beyond a reasonable doubt the existence of an aggravating circumstance, and for no other purpose.

At the time of the offenses in this case, this Court had consistently held that it was improper for the prosecution to introduce evidence or make arguments based on the facts underlying a prior violent felony conviction being used to establish the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2) where the prior conviction on its face involved violence to the person. See State v. Bigbee, 885 S.W.2d 797, 812 (Tenn. 1994); see also Odom, 137 S.W.3d at 585.[10]

In Bigbee, the prosecution introduced the facts underlying the defendant's prior conviction for first degree murder in which the victim had been shot three times, argued that the jury should consider that the defendant had committed two killings, and suggested that the death penalty was appropriate because the defendant already had received a life sentence for the prior murder. Bigbee, 885 S.W.2d at 810. This Court remanded for a new sentencing hearing after concluding that the inadmissible evidence and the prosecutorial argument improperly enhanced the aggravating circumstance and affected the jury's determination to the prejudice of the defendant. Id. at 812.

Similarly, in Odom, the prosecution introduced details of a prior first degree murder committed by the defendant in support of the aggravating circumstance in Tennessee Code Annotated section 39-13-204(i)(2). Odom, 137 S.W.3d at 585. The details included testimony from the investigating officer of the prior crime, as well as photographs of the victim of the prior offense. After noting that the prosecution relied heavily on the facts underlying the defendant's prior felony convictions to enhance the effect of this aggravating circumstance during its closing argument, we remanded for a new sentencing proceeding.

---

[10] In 1998, the legislature amended statutory provisions to allow the prosecution to introduce the facts underlying a prior violent felony being used to seek the death penalty. Tenn. Code Ann. § 39-13-204(c). The amendment is not applicable in this case. See Odom, 137 S.W.3d at 585.

We conclude that the prosecutor's arguments in the present case, although error, do not warrant a new sentencing proceeding. Unlike <u>Bigbee</u> and <u>Odom</u>, the prosecutor did not introduce evidence of the facts underlying the defendant's prior first degree murder convictions. Although the prosecutor repeatedly mentioned that the defendant had now killed four people, the jury was aware of the defendant's prior convictions for two counts of first degree murder and was aware that the prosecution was relying on these prior convictions to establish an aggravating circumstance. While the reference to the defendant's killing four people in "cold blood" could be interpreted to mean that the prior first degree murder offenses were similar to the present offenses, that reference alone does not amount to misconduct of the degree and severity described in <u>Bigbee</u> and <u>Odom</u>. In addition, the trial court properly gave two curative instructions to the jury, which we must presume were followed by the jury. <u>See</u> <u>State v. Shaw</u>, 37 S.W.3d 900, 904 (Tenn. 2001) (the jury is presumed to follow curative instructions). Although the prosecutor's argument was prosecutorial misconduct and error, the defendant objected, and the trial court sustained the objection and gave curative instructions. Accordingly, we conclude that the trial court did not abuse its discretion and that the prosecutorial misconduct did not affect the outcome of the trial.

## CONCLUSION

After reviewing the record and applicable authority, we hold as follows: 1) the trial court did not err in finding that the defendant was competent to stand trial; 2) the trial court did not err in excluding evidence during the competency hearing; 3) the trial court did not err in refusing to hold a new competency hearing on the basis that a court-appointed expert was biased; 4) the evidence was sufficient to support the defendant's convictions; 5) the trial court did not err in denying the defendant's motion to dismiss on the basis that the aggravating circumstances were not stated in the indictment; 6) the trial court did not err in allowing the prosecution to amend the indictment; 7) the trial court did not commit reversible error in limiting extrinsic evidence of prior inconsistent statements; 8) the evidence was sufficient to support the aggravating circumstances found by the jury; 9) the death sentences were not arbitrary or disproportionate as imposed in this case; 10) the evidence was sufficient to support the jury's finding that evidence of aggravating circumstances outweighed evidence of mitigating circumstances; 11) the capital sentencing statutes are not unconstitutional on the basis that they allow evidence to be admitted in violation of due process and confrontation under the United States Constitution; 12) the trial court did not err in admitting crime scene photographs of the victims during sentencing; 13) the trial court did not commit reversible error in failing to charge the jury on the "catch-all" statutory provision as to mitigating circumstances; and 14) the trial court did not err in denying a new trial based on alleged prosecutorial misconduct during sentencing.

The Court of Criminal Appeals' judgment is affirmed. The sentence of death shall be carried out on the 5th day of October, 2005, unless otherwise ordered by this Court or other proper authority.. It appearing that the defendant is indigent, costs of the appeal are taxed to the State.

_____
E. RILEY ANDERSON, JUSTICE