# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 15, 2011

## STATE OF TENNESSEE v. DEMETRIA NANCE

**Appeal from the Criminal Court for Knox County**
**No. 90864      Bob R. McGee, Judge**

---

**No. E2010-00955-CCA-R3-CD - Filed May 20, 2011**

---

Following a jury trial, the Defendant, Demetria Nance, was convicted of one count of second degree murder, a Class A felony, and one count of possession of a deadly weapon, a Class E felony. See Tenn. Code Ann. §§ 39-13-210(c), -17-1307(d)(3). In this appeal, she raises the following issues for our review: (1) The State presented insufficient evidence to support her conviction for second degree murder; and (2) The trial court erred by not declaring a mistrial after a writing from the Defendant to the victim, which had not been given to the defense during pre-trial discovery, was mentioned in front of the jury. After our review, we affirm the judgments of the trial court but remand for entry of a corrected judgment for the Defendant's conviction of possession of a deadly weapon.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ,, joined.

Bruce Poston, Knoxville, Tennessee, for the appellant, Demetria Nance.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

The victim, Aaron ("Nagy") Benton, III, was shot and killed on December 11, 2008, by the Defendant, his on-again-off-again girlfriend. In February 2009, a Knox County grand jury returned an indictment charging the Defendant with first degree murder, especially aggravated stalking, aggravated stalking, employing a firearm during a dangerous felony, and possession of a deadly weapon. The Defendant's trial was held November 9-12, 2009.

Shawna Griffin, the victim's sister, testified that her brother and the Defendant dated for about two years. She said that their relationship "wasn't good," and she stated that, one time when they broke up, the Defendant would not let the victim have his clothes back. She said that, another time, the Defendant sprayed mace in the victim's face. In December 2008, the victim started avoiding the Defendant. The victim told his sister to tell the Defendant that he was not at home when the Defendant called their house. Ms. Griffin recalled that, on the morning of December 9, 2008, the victim told her that he "was done" with the Defendant. She also said that the victim told her that he was tired of being "used" for money by the Defendant. Ms. Griffin estimated that, in the days immediately before the victim was killed, she saw the Defendant come around their neighborhood at least six times looking for him. Regarding what the Defendant was going to do when she found the victim, Ms. Griffin testified that the Defendant said, "I'm going to get him. Tell him I'm going to beat him up."

Around 8:00 or 8:30 a.m. on the morning of December 11, 2008, while Ms. Griffin was lying on the couch and the victim was in his bedroom, their doorbell rang. Ms. Griffin said that she told her brother, "[D]on't get that door, you know it's her," and that the victim replied, "[W]ell I'm just going to tell [sic] I'm done, I'm done." Ms. Griffin testified that the victim opened the door and that the Defendant came inside and said, "[W]hy you been avoiding me? Why you ain't called me?" Ms. Griffin stated that the victim replied, "I'm just done." At that point, the Defendant asked the victim if they could go outside and talk about it, and he complied. Ms. Griffin overheard the victim tell the Defendant that he was tired of giving her money and that he did not "want to do this no more." She said that the victim then told her to call the police and, as Ms. Griffin was walking to the door, she heard the Defendant say, "[Y]ou don't want to be with me?" and then she heard three gunshots. When Ms. Griffin opened the door, her brother fell onto the floor inside their house. She said that when she opened the door, the Defendant was already "at her car pulling off."

Deante Hall, a neighbor and childhood friend of the victim, testified that the relationship between the victim and the Defendant was "off and on a lot" and that the victim told him that "they fought a lot." Mr. Hall said that, on one occasion, the victim showed him a stab wound in his leg and said that the Defendant stabbed him in order to prevent him from

going home. Mr. Hall testified that he spoke with the victim on December 8, 2008, and that the victim said that he had broken up with the Defendant. Because the Defendant often drove through their neighborhood looking for the victim, he asked Mr. Hall to watch for the Defendant and let him know if she was coming by. Mr. Hall said that, between December 8, 2008, and December 11, 2008, he saw the Defendant drive through their neighborhood about seven or eight times. He said that sometimes she would park near some bushes down the street and watch the victim's house. One time, the Defendant asked Mr. Hall where the victim was and he told her that he thought the victim was with her. The Defendant then told Mr. Hall that, when she found the victim, they were "going to fight."

Dr. Darinka Mileusnic-Polchan, chief medical examiner for Knox County, testified that she performed an autopsy on the victim. She concluded that the victim's manner of death was homicide and that his cause of death was multiple gunshot wounds. Dr. Mileusnic-Polchan described that the victim had sustained three gunshot wounds: one in the right side of his lower back, one in his right buttock, and one in his right thigh. She stated that the later two gunshot wounds were "through-and-through," meaning that the bullet also exited the victim's body. Dr. Mileusnic-Polchan testified that, from examining the wounds, she concluded that all three bullets entered from the back-side of his body. She also stated that, because she did not find evidence of soot or gunpowder residue, she believed the gun was fired from a distance greater than two to three feet away from the victim.

Joe Cox, a crime scene investigator with the Knoxville Police Department, testified that he found four cartridge casings at the crime scene, which indicated to him that there were four gunshots from a semi-automatic weapon.

The Defendant testified that she had been robbed in the past and, as a result, she applied for and obtained a concealed-gun carry permit in the summer of 2005 and, thereafter, bought a Smith and Wesson nine millimeter handgun. She said that she always carried her gun with her in her purse. The Defendant stated that, on December 11, 2008, after she had not seen the victim for two days, she went over to his house and rang the doorbell. She said that the victim let her in the house but that, shortly after, the two of them went outside to talk. She recalled, "He told me that it was over. I just remember asking him why. I kept saying why. He said he was through. He was tired." The Defendant continued, "I asked him if we could work it out. He said no."

The Defendant testified that the victim got up to go inside the house and shoved her to the side. As the victim started to go in the door, the Defendant said that she took her gun out of her purse and fired. The Defendant testified that she could not remember how many times she fired because "[i]t happened so fast." She claimed that she aimed at the victim's leg and was not trying to kill him. In fact, she said that she did not know that she had killed

the victim until she saw it on the news. However, she did admit that she ran away immediately after the shooting because she was scared.

On cross-examination, the Defendant said that she threw her gun in a garbage dumpster at a local housing project and then stayed with her cousin for a few days, rather than going back to her apartment or her mother's residence. Although she did not see the victim fall down after she fired the gun, the Defendant testified that she knew she had hit him because she was "a very good aim." The Defendant acknowledged that she had taken an eight-hour-long class in gun safety, but claimed that she "did not know that a person could die from a shot to the leg."

The jury convicted the Defendant of second degree murder, a lesser-included offense of first degree murder, and possession of a deadly weapon. The jury found the Defendant not guilty of especially aggravated stalking, aggravated stalking, and employing a firearm during a dangerous felony. The trial court sentenced the Defendant to concurrent terms of eighteen years for second degree murder and two years for possession of a deadly weapon. The Defendant now appeals.

**Analysis**

In this appeal, the Defendant presents the following issues for our review: (1) The State presented insufficient evidence to support her conviction for second degree murder[1]; and (2) The trial court erred by not declaring a mistrial after a writing from the Defendant to the victim, which had not been given to the defense during pre-trial discovery, was mentioned in front of the jury.

### I. Sufficiency

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime

---

[1] She does not challenge her possession of a deadly weapon conviction on appeal.

beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Tennessee Code Annotated section 39-13-210(a)(1) provides that second degree murder is "[a] knowing killing of another." "Knowing" is defined as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-302(b). Our supreme court has explained that second degree murder is a "result-of-conduct offense" and that "[t]he statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Additionally, our statutes provide that the requirement of "knowingly" is met if it is established that the person acted intentionally. See Tenn. Code Ann. § 39-11-301(a)(2); see also Tenn. Code Ann. § 39-11-302(a) ("'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.").

In the light most favorable to the State, we conclude that the jury was presented with sufficient evidence to convict the Defendant of second degree murder beyond a reasonable doubt. The proof at trial established that the Defendant went over to the victim's house to look for him, as he had been avoiding her for a couple of days. The victim answered the door and told the Defendant that he wanted to end their relationship. Ms. Griffin testified that she heard the Defendant reply, "[Y]ou don't want to be with me?" and then she heard three gunshots. The Defendant admitted that, as the victim was walking back into the house, she

pulled out her handgun from her purse and fired it at the victim. The Defendant testified that she could not remember how many times she fired because "[i]t happened so fast." She also admitted that, although she did not see the victim fall down after she fired the gun, she knew she had hit him because she was "a very good aim." Dr. Mileusnic-Polchan testified that the victim sustained three gunshot wounds, all of which entered from the victim's back-side. We conclude that the State presented sufficient evidence for a rational trier of fact to conclude that the Defendant was aware that, when she shot at the victim multiple times, her conduct was reasonably certain to cause his death. See also State v. Ely, 48 S.W.3d 710, 723-24 (Tenn. 2001) (affirming the defendant's conviction for second degree murder and stating, "The evidence shows that the defendant aimed and fired a handgun in the general direction of a van containing three people. Such conduct clearly falls within the definition of knowing conduct because [the defendant] had to be aware that he was reasonably certain to strike and kill one of those people."). The Defendant is not entitled to relief on this issue.

## II. Mistrial

During the State's cross-examination of the Defendant, the following transpired:

> [Prosecutor]: But your relationship you said—in that relationship you said—you told this jury that there was never any threatening behavior, correct?
>
> [The Defendant]: That's correct. There was none.
>
> [Prosecutor]: You never threatened him with any violence. Is that what you told this jury?
>
> [The Defendant]: That's correct. I never did.
>
> [Prosecutor]: Okay. So would it be fair to say that you have never told Aaron that if he spent the night out that you could punch him in the face?
>
> [The Defendant]: I've never said that.
>
> [Prosecutor]: How about in writing?

At that time, defense counsel objected because the State had not turned over this writing during discovery, and a hearing was conducted outside the presence of the jury. The trial court sustained the Defendant's objection to the admissibility of the written statement but denied her motion for a mistrial and instructed the jury as follows:

Ladies and gentlemen of the jury, right before you left, a reference was made to a writing. The [c]ourt has the obligation of applying the Rules of Evidence to determine what's admissible and what's not. That will be brought up again in your instructions. That is not a matter for you to be concerned with. You—you are to receive all of the evidence that is legally admissible and you're not to worry about anything else. So just—whatever the writing was is not going to be part of the case. So just don't consider it for any purpose at all. And I know you're smart enough to do that. Don't—don't worry about what—what the writing might have contained. It's—it's not for you. Just make your decision entirely upon the evidence that is presented to you from the stand.

The Defendant asserts that, because the State questioned her about a writing that was not provided in discovery, the trial court erred by not declaring a mistrial.

"A mistrial is usually appropriate in a criminal case only where there is a 'manifest necessity.'" State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (quoting Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Id. An abstract formula should not be applied mechanically in determining whether a mistrial was necessary, and all relevant circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993). Whether a mistrial should be granted is a determination left to the sound discretion of the trial court. State v. Reid, 164 S.W.3d 286, 342 (citing State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994)). The trial court's decision should not be overturned absent an abuse of discretion. Id. Additionally, we note that the party arguing that a mistrial should have been granted bears the burden of establishing its necessity. Id. (citing Williams, 929 S.W.2d at 388).

Although we do not condone the actions of the prosecutor, we conclude that the trial court did not abuse its discretion by failing to declare a mistrial. The State asked only one question that referenced the writing, and defense counsel promptly objected before his client could answer. Moreover, the trial court instructed the jury to disregard the reference to the writing, and "[j]uries are presumed to follow the trial court's instructions." State v. Banks, 271 S.W.3d 90, 134 (Tenn. 2008). We conclude that, given the circumstances presented in this case, there was not a manifest necessity for the trial court to declare mistrial. The Defendant is not entitled to relief on this issue.

### III. Corrected Judgment Form

During our review of the record, we noticed that the statute section listed on the Defendant's judgment form for her conviction of possession of a deadly weapon is incorrect.

The Defendant's indictment for this count lists Tennessee Code Annotated section 39-17-1307. However, even though the jury convicted the Defendant for the indicted offense on this count, the judgment form states that the Defendant was charged with a Class C felony, but was convicted of a Class E felony, and lists Tennessee Code Annotated section 39-17-1324 as the statute under which she was convicted. Further leading us to the conclusion that the judgment form is incorrect is the fact that the trial court sentenced the Defendant within the range for a Class E felony, which would be correct for a conviction under section 39-17-1307(d)(2), but incorrect for a conviction under section 39-17-1324. Therefore, we remand this case to the trial court so that the judgment for the Defendant's conviction of possession of a deadly weapon may be corrected to reflect the proper code section—Tennessee Code Annotated section 39-17-1307(d)(2).

### Conclusion

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand for entry of a corrected judgment form for the Defendant's conviction of possession of a deadly weapon.

_____
DAVID H. WELLES, JUDGE