# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs June 22, 2011

## STATE OF TENNESSEE v. DIB DRIVER

Appeal from the Circuit Court for Rutherford County
No. F-63528   David M. Bragg, Judge

### No. M2010-01570-CCA-R3-CD - Filed November 8, 2011

The Defendant, Dib Driver, was found guilty by a Rutherford County Circuit Court jury of solicitation of sexual exploitation of a minor, a Class B felony; six counts of attempted solicitation of sexual exploitation of a minor, a Class C felony; two counts of sexual battery by an authority figure, a Class C felony; two counts of attempted sexual battery by an authority figure, a Class D felony; attempted sexual battery, a Class A misdemeanor; and two counts of attempted assault, a Class C misdemeanor.  See T.C.A. §§ 39-12-101 (2010) (attempt), 39-13-101 (2006) (amended 2009, 2010) (assault), 39-13-505 (2010) (sexual battery), 39-13-527 (2010) (sexual battery by an authority figure), 39-13-529 (2010) (solicitation of sexual exploitation of a minor).  He was sentenced as a Range I, standard offender to serve ten years for solicitation of sexual exploitation of a minor, five years for two counts of sexual battery by an authority figure, four years for six counts of attempted solicitation of sexual exploitation of a minor, three years for two counts of attempted sexual battery by an authority figure, eleven months and twenty-nine days for attempted sexual battery, and thirty days for two counts of attempted assault.  The trial court imposed partially consecutive sentences yielding an effective fifteen-year sentence for these offenses.  After the convictions, the Defendant pled guilty to attempted especially aggravated kidnapping, a Class B felony, pertaining to a count of the indictment that was severed from the counts charging sexual offenses.  See id., § 39-13-305 (2010) (especially aggravated kidnapping). The court imposed a twelve-year sentence consecutively to the effective fifteen-year sentence for the other convictions, for a final effective sentence of twenty-seven years.  On appeal, the Defendant contends that the trial court erred in denying his two motions for a mistrial. We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Derek R. Howard (at trial and on appeal) and Darwin H. Colston (on appeal), Murfreesboro, Tennessee, for the appellant, Dib Driver.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; William Whitesell, District Attorney General; and Laural Hemenway, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions arose from sexual offenses against the victim, M.G. She was legally adopted by her biological grandmother, who lived with the Defendant. This opinion will refer to her as the victim's mother. There was conflicting proof at the trial about whether the victim's mother and the Defendant were married. The Defendant's sexual assaults of the victim spanned various time periods between July 2007 and February 2008. The victim testified that she turned nineteen on February 1, 2010, meaning the offenses took place when she was sixteen to eighteen years old.

The victim testified that for a time, she participated in extracurricular activities at school but later was not allowed to do so. She said the Defendant promised to talk to her mother about allowing her to resume participation in the extracurricular activities if she would allow him to "do things" to her. She said that the Defendant wanted her to "let him put his penis between [her] legs and rub there for a minute or two" and that she agreed. She said that she and the Defendant were in the master bedroom and that she pulled down her pants and watched a clock as the Defendant rubbed against her and ejaculated. She said that she was sixteen at the time and that the date was approximately July 16, 2007. She said there were four other encounters in July 2007, the second being the day after the July 16 incident. She said that she began sleeping in blue jeans to make it more difficult for her pants to be removed and that there were about six other incidents after she began sleeping in blue jeans that summer.

The victim testified that after she came home from school one day, the Defendant asked her to help him move a fish tank and furniture in the master bedroom. She said that as she went up the stairs, the Defendant grabbed her waist, pulled her, and threw her into the bedroom. She said the Defendant told her that either she could allow him to put his penis between her legs or he would rape her. She screamed and began having an asthma attack. The Defendant yelled for her to "forget it" and did not continue the assault. The victim said that there had been no inappropriate contact for some time before this incident and that she became fearful after it.

The victim testified that on one occasion, the Defendant told her to wash herself, then knocked on the bathroom door and said she had a telephone call. She said that when she came out of the bathroom in a towel, the Defendant slammed her to the bed and told her not to scream or he would rape her. She said she grabbed a knife she had hidden and cut the Defendant on his stomach.

The victim testified that on another occasion, the Defendant took her to gather fire wood and pushed her down while they were in his truck. She pulled a pocket knife, and he grabbed it. She said that she screamed and resisted and that the Defendant told her to stop but eventually left her alone. She said the Defendant claimed he was only trying to hug her and said he did not understand her reaction. The victim said that after the attack in the truck, she and the Defendant had an agreement that he would no longer ask her to do anything sexual, that they did not have to be in the same room, that he would stay on the other side of the room if they were in the same room, and that he would not talk to her before her mother came home from work.

The victim testified that when she came home from school on February 12, 2008, the Defendant was in the kitchen cooking a pizza and asked her to come into the kitchen to check the pizza. She thought this was strange and told him she had a large amount of homework. She said that the Defendant began yelling and that he scared her. She left the house through a back door. She said the Defendant called her cell phone several times after she left, but she did not answer. She called her mother to pick her up. After she was with her mother, she revealed the sexual offenses. She said she had not told her mother previously because the Defendant claimed the stress would be dangerous to her mother's health.

The victim's mother testified that while she was at work on February 12, 2008, the victim called her and revealed the Defendant's actions. She said that while she was in her truck, the Defendant called, and she informed him of the victim's allegations. She said the Defendant accused the victim of lying. She said the victim screamed at the Defendant on the telephone that he knew he had done the things the victim claimed. She and the victim went to the Sheriff's Department concerning the allegations. She said she told the Defendant that she was bringing the victim home to change clothes and that she did not want the victim to be in his presence.

The victim's mother testified that when she and the victim arrived home, the Defendant said that she and the victim were trying to ruin his life. She told the Defendant to go to her brother-in-law's home nearby. The Defendant left but called to ask if she would bring him some food. She told him he could return to the house to get food.

The victim's mother testified that after the Defendant went to her brother-in-law's house, she noticed that a handgun and $3450 in cash were missing from the home. She said she called her brother-in-law and asked him to question the Defendant about the gun's whereabouts. Outside the presence of the jury, defense counsel moved for a mistrial on the basis that the evidence about the Defendant's taking a gun was prejudicial and was contrary to an earlier ruling of the court. The trial court denied the motion for a mistrial and found that the evidence did not show a bad act by the Defendant, and therefore, the Defendant was not prejudiced. The court reminded counsel for both parties:

> [T]his court has previously ruled that the statement that Mr. Driver made [about killing the victim's mother and the victim] when he came back to the house is admissible as his statement, and that what [the victim's mother] is not . . . allowed to do is to talk about using the handgun in a threatening manner or pointing the handgun at her.
>
> So, Counsel, for . . . the State as well as for the Defendant, will have to be cautious when they answer questions concerning that.

The victim's mother testified that during the telephone call, she stubbed her toe and found a loaded STS rifle under the bedroom carpet. She said the Defendant told her that he put the gun and money in another drawer for safekeeping and that he and the victim were going to use the rifle to kill stray dogs. She said she looked through the drawers where the Defendant claimed to have put the handgun and the money but did not find either.

The victim's mother testified that she heard a knock on the door and that she sent the victim to the victim's bedroom. She allowed the Defendant to come inside to get the food. She said that the Defendant was not argumentative and that she took the food from the refrigerator and a cabinet. She said that as she tied the grocery bag containing the food, the Defendant spun her around and said he was going to kill the victim and her because he was not going to jail. She said the Defendant told her that "double murder would carry the same amount of time as rape." She said the Defendant also stated that he could not go to jail because "his brother had a contract on him." The victim's mother said, "He asked me to call [the victim] in. I said, . . . why are you doing this[?] Put the gun down. Do you know how guilty you're making yourself look? The man actually showed me –." Outside the presence of the jury, defense counsel again objected that the testimony was contrary to the court's ruling. The trial court denied the motion for a mistrial and cautioned:

The Court would take this opportunity, again, to remind Counsel that this Court has stated that Mr. Driver's statement that he made to [the victim's mother] concerning – or actually the statement that's already come into evidence is allowed into evidence. But nothing else concerning a gun or what he did with the gun or any other events related to the charges that arose out of the events on February 12th is admissible in this case.

The court then instructed the witness:

COURT:  Now . . . having said that, let me give you some direction, okay.

WITNESS:  Yes, sir.

COURT:  You are allowed to make the statement which you have already made that [the Defendant] made to you concerning his threat, and that he would do more time or [the] same amount of time for a double murder . . . [than] he would do for a rape.

WITNESS:  Yes, sir.

COURT:  That he couldn't go to jail. That his brother had a hit or a contract out on him, and he couldn't go to jail. All right.

WITNESS:  Yes, sir.

COURT:  You are not to testify at all about him holding a gun to your head or him having a gun. You are not to make any statement at all concerning a gun. All right?

WITNESS:  Okay, Your Honor.

The court explained to the witness that there were pending charges related to the February 12 incident that had been severed from the charges being tried. When the court asked if the witness was aware of the severance, she acknowledged that it had been "mentioned" to her.

The court reviewed the witness's testimony with her and advised her that she could not tell the jury that the Defendant made statements that she was not allowed to repeat to them or that she told the Defendant that she was going to check on the victim and he could shoot her in the back if he wanted to do so. The court said again, "[Y]ou cannot say anything about a gun or getting shot or getting threatened with a gun. All right? Because [the Defendant] is also charged with that. And we're going to have a trial on those charges." The court also told the witness not to mention anything the Defendant said he would do if the police came for him.

The jury returned to the courtroom, and the trial court instructed them:

> Ladies and gentlemen, before we took our break during [the witness's] testimony, she made a statement. And during that statement, she made mention of a gun. There is nothing in this case related to a gun. And I have ruled that that statement is irrelevant to the charges related to this case and is inadmissible.
>
> And, therefore, you are to strike from your minds any mention of that word. And you are also not to consider that or make use of that statement that involved a gun during your deliberations in this case.

The State resumed its questioning of the victim's mother, who testified that the Defendant looked through the house for the victim and stated his desire to kill the victim and her mother and that he wanted the victim to watch. She said the Defendant continued to swear on his mother's life that he had not done anything to the victim. She said he called her a "scrawny little girl" and compared her to his nieces. She said that she informed the Defendant "that he and I were over" and that she told him she was going to check on her daughter. She said that she left the house and went across the street to the house where the victim was and that she called 9-1-1.

Willie Gilbert testified that the victim's mother called him on February 12, 2008, and asked if the Defendant could stay overnight at his house. He agreed, and the Defendant came to his house. While the Defendant was there, he overheard the Defendant talking on the telephone with the victim's mother and said the conversation was "something about the gun." He said that the Defendant stated he was going home to get the meal the Defendant had cooked and that the Defendant did not return to his house.

Rutherford County Sheriff's Detective Dwayne "D.J." Jackson testified that he investigated the victim's allegations. He said the Defendant admitted he might have brushed

against the victim's bottom or breasts while wrestling with her but denied rubbing his penis against her thighs or touching her vagina.

The Defendant testified that although he was not the victim's father, he loved her and served as her father figure. He said he was involved in disciplining her, although he later said the victim's mother disciplined her and he only gave advice. He denied that he ever placed his penis between the victim's thighs or that he ever talked to the victim about doing so. He said he never had any type of sexual encounter with the victim. He said that he broke two bones in his leg in September 2007 and that he was still on crutches in February 2008.

The Defendant testified that the victim kissed him and said goodbye to him before she left for school on February 12, 2008. He said that when she came home that afternoon, he was cooking pizza for her. He said that he told her to come to the kitchen to get the pizza and that he could not carry the pizza while using crutches. He said that the victim told him she would be there in a minute but that when he walked into the room where she had been, she was gone. He said he went outside but did not find her. He said that he called the victim's mother to report the victim's absence and that she said she would call him back. About fifteen to twenty minutes later, the victim's mother called and told him to leave the house. He said she said the victim "told me what you have been doing to her." He said that he told her he had not inappropriately touched the victim and that he suggested both he and the victim take polygraph examinations.

The Defendant testified that the victim and her mother came home and that the victim went to her room while he and her mother talked. He said that at the victim's mother's insistence, he went to Willie Gilbert's house. He said she called Mr. Gilbert's house, spoke with Mr. Gilbert, and spoke with the Defendant. He said she asked him where the gun was and invited him to return to the house to get food. He said she began gathering food for him but then started yelling at him. He said that she left through the back door and that he did not see her again until he was in court. He denied saying that he was going to kill her and the victim. He denied saying he could not go to jail because his brother had a contract on his life and claimed he talked to his brother at least once a month. He said he would never harm the victim or put his penis between her legs and that "somebody put her up to say that" or the victim was mad at him. He said the only thing he might have done to make the victim that angry was trying to stop her from seeing her boyfriend. He said he never showed the victim his penis. He said he did not grab the victim's waist and throw her onto a bed or "tackle" her in a truck. He said that he did not have her help move a dresser and that the only dresser in the room was so heavy that "it would take two good men to even budge it."

The Defendant testified that he was not good with dates. He could not recall the dates he received various injuries. He acknowledged that he was able to move around the house

and do farmwork before September 2007. He admitted the victim sometimes accompanied him when he did farmwork. He claimed that on February 12, he walked through a field to and from Willie Gilbert's house on crutches. He said he was not seen walking on crutches on the video recording of his statement because the police took the crutches away. He said he used a cane while he was on the telephone that night because he could not hold the telephone while on crutches. He denied that he drove to Tunica after the September 2007 injury.

The victim's mother testified on rebuttal that the Defendant was not using crutches on February 12. She said that he drove to Tunica on a family trip after he was injured and that he drove on weekend rides. She said the Defendant drove her red truck. She said the Defendant and the victim obtained wood for a stove in her home. She said that they went to the woods, that the Defendant cut the wood, that the Defendant and the victim brought it to the house, and that she helped them unload it. She said this was after the September 2007 injury. She said the Defendant claimed that his brother had a contract on his life because he testified at his brother's trial. She said that the victim was examined after running away from home in 2005 and that the "practitioner" determined that the victim had not been sexually active. She denied that she had the victim make false allegations against the Defendant. She said that she did not stand to gain financially from the Defendant leaving her home and that she suffered financial losses after the allegations came to light. She said she obtained a second mortgage on her home to buy the property next door jointly with the Defendant. She said that a truck titled in her name but driven by the Defendant burned in the woods, that the insurance company paid the bank for the truck loan, and that another truck the Defendant drove was returned to the dealer. She said a lien was placed on the jointly owned real property because the Defendant failed to appear in court about the truck that was returned to the dealer.

On rebuttal, the victim testified that she did not fabricate allegations against the Defendant at anyone's insistence. She said she did not have sexual relations with a boy she spent the night with in a ball field in December 2006. She was certain the night at the ball field was in 2006, not 2005. She said that she was expelled from school in February 2007, that the Defendant's inappropriate conduct began in July 2007, that the Defendant's accident was in September 2008, that she skipped school with her boyfriend in February 2008, and that she told her mother about the Defendant's misconduct on February 12, 2008.

The State recalled Willie Gilbert, who testified that the Defendant did not have crutches when he came to Mr. Gilbert's home on February 12, 2008. He did not know whether the Defendant left the crutches outside. He acknowledged he had said previously that the Defendant never brought his crutches inside if he had them. He said the Defendant used a crutch a week or so after he had a rod put in his leg and used it "off and on" thereafter.

He said that after the Defendant's injury, he saw the Defendant mowing, feeding horses, and completing similar tasks. He said the Defendant was able to do things around the farm.

The jury found as follows:

| COUNT | CHARGE | VERDICT |
|---|---|---|
| 2 | Solicitation of Sexual Exploitation of a Minor | Guilty of Attempted Solicitation of Sexual Exploitation of a Minor |
| 3 | Solicitation of Sexual Exploitation of a Minor | Guilty of Attempted Solicitation of Sexual Exploitation of a Minor |
| 4 | Solicitation of Sexual Exploitation of a Minor | Guilty of Attempted Solicitation of Sexual Exploitation of a Minor |
| 5 | Solicitation of Sexual Exploitation of a Minor | Guilty of Attempted Solicitation of Sexual Exploitation of a Minor |
| 6 | Solicitation of Sexual Exploitation of a Minor | Guilty of Attempted Solicitation of Sexual Exploitation of a Minor |
| 7 | Solicitation of Sexual Exploitation of a Minor | Guilty of Charged Offense |
| 9 | Attempted Rape | Guilty of Attempted Misdemeanor Assault |
| 10 | Attempted Rape | Guilty of Attempted Misdemeanor Assault |
| 11 | Attempted Rape | Guilty of Attempted Sexual Battery |
| 13 | Attempted Solicitation of Sexual Exploitation of a Minor | Not Guilty |
| 14 | Attempted Solicitation of Sexual Exploitation of a Minor | Guilty of Charged Offense |
| 15 | Attempted Solicitation of Sexual Exploitation of a Minor | Not Guilty |
| 16 | Attempted Solicitation of Sexual Exploitation of a Minor | Not Guilty |
| 18 | Sexual Battery by an Authority Figure | Guilty of Charged Offense |
| 19 | Sexual Battery by an Authority Figure | Guilty of Charged Offense |
| 20 | Sexual Battery by an Authority Figure | Not Guilty |
| 21 | Sexual Battery by an Authority Figure | Not Guilty |

| 22 | Sexual Battery by an Authority Figure | Not Guilty |
|---|---|---|
| 23 | Sexual Battery by an Authority Figure | Guilty of Charged Offense |
| 24 | Sexual Battery by an Authority Figure | Not Guilty |
| 25 | Attempted Sexual Battery by an Authority Figure | Not Guilty |
| 26 | Attempted Sexual Battery by an Authority Figure | Not Guilty |
| 27 | Attempted Sexual Battery by an Authority Figure | Guilty of Charged Offense |

The court sentenced the Defendant to an effective fifteen-year sentence for the offenses. The Defendant later pled guilty to attempted especially aggravated kidnapping and received a twelve-year sentence to be served consecutively to the effective fifteen-year sentence. This appeal followed.

The Defendant contends that the trial court erred in denying his motions for a mistrial. The State counters that the trial court did not abuse its discretion in denying the motions. We agree with the State.

A mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "In reviewing for an abuse of discretion, this court has held that the following three factors should be considered: (1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

With respect to the first motion for a mistrial, we note that the evidence was elicited, at least indirectly, by the State's open-ended questioning of the victim's mother. The prosecutor asked, "[A]fter [the Defendant] went to [Mr. Gilbert's house], then what happened?" The victim's mother responded with a lengthy narrative that included, "when I went looking for [the paperwork for preparing a tax return], I found out the gun was missing. The handgun was not in the drawer. So I called [Mr. Gilbert]. I asked him, please

ask [the Defendant] where the handgun is." At this point, defense counsel objected and requested a mistrial. In denying the motion for a mistrial, the trial court reminded the parties, "What [she] is not . . . allowed to do is to talk about using the handgun in a threatening manner or pointing the handgun at her."

Despite the admonitions the trial court gave, the victim's mother again violated the court's ruling when the State asked another open-ended question and she responded with a narrative. With respect to this instance, we note that her response was beyond the scope of the question. The prosecutor asked, "And did [the Defendant] say anything else?" The witness answered the question and then continued, "I said, [to the Defendant] why are you doing this. Put the gun down. Do you know how guilty you're making yourself look? The man actually showed me –." We also note that the witness had just been cautioned about the parameters of her testimony. We conclude that on this occasion, the evidence was not elicited by the State.

The record reflects that the trial court gave an appropriate instruction that the jury disregard the evidence. We presume the jury followed the trial court's instruction. See State v. Reid, 164 S.W.3d 286, 346 (Tenn. 2005).

We have also considered the relative strength or weakness of the State's proof. See Welcome, 280 S.W.3d at 222. In that regard, we note that the victim testified in detail about the allegations. The Defendant flatly denied them. Both the victim and the Defendant were subject to thorough cross-examination and impeachment. Although the defense impeached the victim's credibility in some respects, the State's cross-examination and rebuttal proof provided a significant attack to the Defendant's credibility. The jury's verdicts reflect that it accepted neither the full measure of the victim's nor the Defendant's testimony. The jury acquitted the Defendant entirely of nine counts, acquitted him of the charged offense and found him guilty of a lesser included offense for eight counts, and found him guilty of six charged offenses.

Upon review, we conclude that the trial court did not abuse its discretion in denying the Defendant's motions for a mistrial. The Defendant is not entitled to relief.

As a matter of plain error, we note a clerical error in the judgment for Count 9. The box that should reflect that the Defendant was found guilty is unmarked. We likewise note that the judgment for Count 1, the count to which the Defendant pled guilty, lists the Code section for the conviction offense as section 39-13-202, although the correct section is 39-13-305. The trial court should correct the clerical errors.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE