IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 17, 2021

## STATE OF TENNESSEE v. TIMOTHY M. DAWSON

**Appeal from the Criminal Court for Loudon County**
**No. 2014-CR-190      Jeffery H. Wicks, Judge**

_____

### No. E2020-01525-CCA-R3-CD

_____

The defendant, Timothy M. Dawson, appeals his Loudon County Criminal Court jury conviction of theft of property valued at $10,000 or more but less than $60,000, arguing that he is entitled to a new trial on grounds that he was incapacitated during the *Momon* colloquy. *See Momon v. State*, 18 S.W.3d 152 (Tenn. 1999). Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JILL BARTEE AYERS, JJ., joined.

J. Patrick Henry, Kingston, Tennessee (on appeal), and Alan Moore, Lenoir City, Tennessee (at hearing), for the appellant, Timothy M. Dawson.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Russell Johnson, District Attorney General; and Tiffany Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In August 2014, the Loudon County Grand Jury charged the defendant with one count of theft of property valued at $10,000 or more but less than $60,000 for the theft of a tractor from Dennis Montooth.

At the defendant's January 2017 trial, Mr. Montooth testified that his John Deere tractor and the loader were stolen from "in front of the shop" on his farm. He recalled that he had parked the tractor in that location with the keys in it because he intended to use it in the repair of a damaged portion of fencing the following day. When he came outside the next day, however, "my tractor was gone," and he could see the tracks leading "toward

Blue Springs, and then it was just like it vanished." Mr. Montooth telephoned the Loudon County Sheriff's Office ("LCSO") to report the theft.

After speaking to LCSO Deputy Brandon Dixon, Mr. Montooth "went to inquirein' on myself," calling around to his neighbors in an effort to determine if any of them had seen anything. Mr. Montooth testified that he specifically asked one neighbor about the defendant because he had seen the defendant "on my place on a camouflage four-wheeler" approximately "a week, ten days before that." Mr. Montooth recalled that on that occasion, the defendant "[p]ulled right up to my tractor" before "turn[ing] down toward Blue Springs." Mr. Montooth said that he was suspicious of the defendant given the defendant's "past history" and the fact that the defendant "was still riding around late of an evening in the community on a four-wheeler." Mr. Montooth and another man "went in on the back side of [the defendant's place] down there" just across the McMinn County line to investigate. Mr. Montooth said that while in that location he "didn't see [the tractor], but I heard it." He insisted that he could identify the tractor by the "certain racket that that tractor makes." He said that he "[k]new it was mine, but by the time I could get there, it was gone."

At that point, Mr. Montooth telephoned Deputy Dixon and advised him about having heard the tractor. Mr. Montooth told Deputy Dixon that he thought the defendant had taken the tractor. Officers informed Mr. Montooth several weeks later that the tractor had been found. Mr. Montooth went with officers to the tractor's location, which location Mr. Montooth described as "pretty rough" and "kindly desolate." He said that the tractor "was hid real good in the woods." Mr. Montooth testified that the tractor sustained only "cosmetic" damage but that the cost of repairs had been $12,500.00. He said that he had priced replacement tractors prior to the return of his property and that the cost would have been $65,000.00 for the tractor and an additional $10,000.00 for the loader.

LCSO Detective Jeff Russell investigated the theft of Mr. Montooth's tractor. After learning that the defendant had been seen on Mr. Montooth's property "[s]everal days prior" to the theft, he attempted to locate both the defendant and the tractor. To this end, Detective Russell received permission from the owner of the property behind the house that the defendant was renting at the time "to go on that property to look for anything that might be stolen." Detective Russell said that although the officers were unable to locate Mr. Montooth's tractor, they did observe "several tractor tracks in the mud" in the same general area where Mr. Montooth had claimed to have heard the tractor.

At some point, Detective Russell and another officer spoke with the defendant at the Monroe County Jail. When asked if he had taken the tractor, the defendant was initially "reluctant" but eventually used "a Google Earth Map" to "point[] to a general area of a wooded area in McMinn County" where "he had heard that's where the tractor

was hidden." Detective Russell traveled to that area with officers from the McMinn County Sheriff's Office but did not locate the tractor at that time. Later, LCSO Lieutenant Patrick Upton contacted Detective Russell and reported that the defendant "had taken him to the location of the tractor" and had admitted having "taken it in there." Detective Russell recalled that the tractor was located in the general area he had searched earlier but that it was well hidden in the woods.

Detective Russell testified that he observed tire tracks leading from the property where the tractor was found to the defendant's residence and a "stole[n] camouflage four-wheeler." Detective Russell said that he made no attempt to locate the owner of the property where the tractor was discovered because the defendant had shown Lieutenant Upton where the tractor was located "and had made the statement to [Lieutenant] Upton that he had put the tractor there."

LCSO Lieutenant Patrick Upton testified that he and Detective Russell spoke with the defendant about the theft of Mr. Montooth's tractor at the Monroe County Sheriff's Office. The defendant told Lieutenant Upton that "he took the tractor." Lieutenant Upton said that, when asked what he intended to do with the tractor, the defendant "refused to say anything." The defendant "did advise he would tell us where we could locate the tractor." At that point, the officers accessed "a map of Google Earth and he showed us an area in McMinn County where the tractor would be located." Lieutenant Upton said that the location identified by the defendant "was pretty close to where" the tractor was eventually located. Given the "very wooded" terrain, officers were initially unable to locate the tractor. Lieutenant Upton later asked the defendant to return with him to the area, and the defendant agreed. Lieutenant Upton recalled the defendant's "laughing about" the officers' inability to find the tractor. The defendant led him to a location and told him to look, but the lieutenant did not initially see the tractor even though "it was around maybe 20-50 yards in front of me." He said, "I don't know how he got that thing in there, I really don't. It was in some woods that had leaves and trees and brush around it, and you could barely see it." He added, "I don't think anybody would have found it, if we wouldn't have took him where it [wa]s unless the farmer or somebody come across it or something."

During cross-examination, Lieutenant Upton reiterated that the defendant "told me he took the tractor, he hid the tractor, and he could tell us where it's at. Pretty simple."

The 45-year-old defendant testified that Lieutenant Upton contacted him for assistance in locating Mr. Montooth's stolen tractor because the defendant "know[s] everybody in the county." He added that it was not the first time that Lieutenant Upton had made such a request. The defendant said that he agreed to assist Lieutenant Upton "out of the goodness of my heart" because he did not "want to see [Mr. Montooth] loose no 35,

-3-

30,000, or 20,000, I don't want to see him lose a penny as far as that goes." The defendant testified that he knew where the stolen tractor was located because he had "heard it in the neighborhood."

The defendant claimed that Lieutenant Upton and other officers "come to Monroe County, Sweetwater, and ah, basically kicked the door in and come in with guns drawn and stuff." He said that Lieutenant Upton "made a big scene out of the deal . . . and then he's got me handcuffed . . . and he's threatening." The defendant denied having told Lieutenant Upton that he took the tractor. He also maintained that he did not know who had taken the tractor, explaining, "I wasn't there and I didn't see it, but, you know, you hear different stuff, but I don't want to get off in stuff like that." He added, however, that even if "I knew who took it, no, I would not say" because "I just don't live like that." The defendant also denied that he was the person that Mr. Montooth had observed on the four-wheeler on his property, saying that he was physically unable to ride a four-wheeler at the time due to a knee injury.

During cross-examination, the defendant denied that Detective Russell and Lieutenant Upton spoke with him while he was being held in the Monroe County Jail. He denied that officers discovered a camouflage four-wheeler at his residence with tracks leading to the area where the tractor was eventually located. The defendant maintained that Mr. Montooth, Detective Russell, and Lieutenant Upton had lied during their testimony.

Based upon this evidence, the jury convicted the defendant as charged. Following a January 2019 sentencing hearing, the trial court sentenced the defendant, a Career Offender, to 15 years' incarceration. The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

In this appeal, the defendant claims only that the trial court should have granted his motion for new trial "due to the Defendant's lack of understanding of his Constitutional rights during the *Momon* hearing," pointing to evidence adduced at the hearing on the motion for new trial that established that he had been diagnosed with a concussion on the same evening that the *Momon* colloquy took place. The State asserts that the defendant waived plenary review of the issue by failing to raise it in his motion for new trial. In the alternative, the State contends that the defendant's claim lacks merit.

Although the defendant did not frame the issue with the same degree of specificity in his motion for new trial, he did challenge generally his capacity on the day of trial. He narrowed his challenge to the *Momon* colloquy during the new trial hearing. Under these circumstances, the defendant did not waive plenary review of his claim.

-4-

The trial court in this case conducted a *Momon* hearing, at which the defendant was advised by both his attorney and the trial court that the decision whether to testify was the defendant's alone. The defendant acknowledged that he had discussed the issue with his attorney. Although the defendant expressed that he felt he had "no choice" but to testify and that he was not mentally and physically prepared to testify, the record is clear that he wanted to testify because he did not want Lieutenant Upton's testimony to go unchallenged. When questioned by the trial court about his alleged incapacity, the defendant attributed it to "[j]ust everything" and his "nerves." Upon further probing by the court, the defendant added, "It's been an ongoing thing for a while, but today's been actually worse (indiscernible) basically the same thing, everything started running together, (indiscernible) mind is going in and out but you really don't care whether you live or die." Defense counsel indicated that the defendant had "continually told me that he was" of "sound mind physically and mentally." When asked if he had a "health problem," the defendant replied, "Yes, more or less." When asked the nature of the "health problem," the defendant went on a tangent about "trying to do everything you can to take care of your family" and food stamps. He also said that "there's no such thing as health out here, through there." When asked if he was able to testify, the defendant replied, "I do what I can do." He said that he felt "like there's something wrong" but that he wanted to "get on with it." The defendant went on to offer testimony that was mostly responsive to the questions asked of him.

At the September 2020 hearing on the motion for new trial,[1] the defendant testified that he suffered an injury prior to the trial and that, as a result, he only remembered "bits and pieces of" the trial and specifically could not recall having discussed his testifying at trial with trial counsel. He insisted that he did not recall having signed a form stating that he had discussed the issue with his counsel before taking the stand. He maintained that he did not recall the trial court's informing him that the decision to testify lay with him and that he did not recall the *Momon* hearing at all. He said, indeed, he did not remember anything after his arrival at the courthouse. He did recall "taking a shower after I got up off the ground and was unconscious" and driving to court. The defendant testified that he telephoned trial counsel and "said look man, I honestly don't need to be driving." The defendant agreed that he was present during the trial but reiterated that he did not "recall anything about the trial really." He insisted that he lacked the capacity to make the decision to testify. The defendant testified that he went by ambulance to the emergency room after the conclusion of his trial.

---

[1]     In response to the COVID-19 pandemic, the Tennessee Supreme Court suspended all in-person court proceedings on March 13, 2020. *See In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Mar. 13, 2020) (Order). The court later modified "the suspension of in-person court proceedings, with appropriate safeguards," to include the continued and increased use of, among other things, video conferencing. *In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Apr. 24, 2020) (Order).

Although he did not describe the manner of his injury, the defendant exhibited to his testimony at the hearing on the motion for new trial one of three pages of a "pre-hospital care report" from American Medical Response, an ambulance service, which page indicated that he had been transported by ambulance from his home in Philadelphia to Sweetwater Hospital at approximately 7:30 p.m. the day of his trial. The chief complaint listed was "lethargy." He also exhibited to his testimony one of three pages from the record of his visit to the Sweetwater Hospital Emergency Room. The record from the hospital indicates that the defendant reported that he had been "hit in the head with a jack hammer this am at work."[2] The defendant was ultimately diagnosed with a "[c]oncussion without loss of consciousness."

In its order denying the motion for new trial, the trial court noted that neither the defendant nor his counsel informed the court before trial that he had been hit in the head with a jackhammer. The court also noted that it had "observed the [d]efendant during the course of the trial and he did not exhibit any signs or symptoms of being hit in the head with a jackhammer." The court stated that the defendant "did not appear to be in any pain" during the trial. The court found that the defendant provided coherent answers to the questions asked of him. The court concluded that the defendant was competent to stand trial and to assist in his defense.

In *Momon*, our supreme court "adopted a prophylactic procedure designed to ensure that a defendant's waiver of the fundamental right to testify is voluntary, knowing, and intelligent." *Mobley v. State*, 397 S.W.3d 70, 90 (Tenn. 2013) (citing *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999)). That procedure requires that,

> when a defendant elects not to testify and to waive his fundamental constitutional right to do so, counsel must hold a colloquy with the defendant on the record, out of the presence of the jury, in which counsel should question the defendant to ensure that the defendant understands that:
>
> (1) the defendant has the right not to testify, and if the defendant does not testify, then the jury (or court) may not draw any inferences from the defendant's failure to testify;
>
> (2) the defendant has the right to testify and that if the defendant wishes to exercise that right, no one can prevent the defendant from testifying;

---

[2]  This record also indicates that emergency medical personnel administered 1 mg of Narcan.

> (3) the defendant has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally waived the right to testify.

*Id.* at 90-91 (citing *Momon*, 18 S.W.3d at 162). The *Momon* court specifically "noted that the prophylactic procedure itself is not constitutionally required." *Mobley*, 397 S.W.3d at 91 (citing *Momon*, 18 S.W.3d at 163). Our supreme court has specifically declined to extend the ruling in *Momon* to those instances when, as here, the defendant elects to testify at trial. *Mobley*, 397 S.W.3d at 91. Because the defendant elected to testify, no *Momon* hearing was required.

To the extent that the defendant's argument can be interpreted as a general challenge to his mental capacity at the time of trial, we conclude that the record does not support a determination that the defendant was incompetent. "The Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee constitution prohibit the trial of a person who is mentally incompetent." *State v. Reid*, 164 S.W.3d 286, 306 (Tenn. 2005) (citations omitted). A competent defendant is one who has "the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." *Mackey v. State*, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975) (citations omitted). The defendant bears the burden of establishing his incompetence by a preponderance of the evidence. *Reid*, 164 S.W.3d at 306.

In our view, the defendant has failed to establish by a preponderance of the evidence that he was incompetent to stand trial or to act as a witness in his own defense. The trial court found that the defendant did not exhibit any indication that he had been struck in the head by a jackhammer and was in pain. Importantly, when given the opportunity by the trial court at the *Momon* hearing to explain the nature of his "health problem," the defendant did not tell the trial court that he had been injured at work before coming to court. Indeed, he did not describe any health problem. Additionally, defense counsel assured the court that the defendant was "physically and mentally" competent to testify.

Additionally, the defendant has failed to establish that he was not competent to be a witness at trial. With certain exceptions not applicable in this case, "[e]very person is presumed competent to be a witness," Tenn. R. Evid. 601, including "mentally incompetent persons," *see id.*, Advisory Comm'n Comments, so long as the witness can "swear or affirm to tell the truth" and has "personal knowledge of that truth," *see id.*

-7-

Nothing in the record suggests that the defendant was not competent to testify, even assuming that the record of his hospital stay *after* trial evinced that he was concussed.

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE